**BSP TRANS, INC., Petitioner,**

v.

**UNITED STATES DEPARTMENT OF LABOR, Respondent,**

---

Robert Michaud, Intervenor.

No. 97–2282.

United States Court of Appeals,
First Circuit.

Heard May 8, 1998.
Decided Nov. 3, 1998.

Lawrence C. Winger with whom Kraft & Winger was on brief for petitioner, BSP Trans, Inc.

Barbara A.W. McConnell, Attorney, United States Department of Labor, Office of the Solicitor, with whom Marvin Krislov, Deputy Solicitor for National Operations, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, and Barbara Werthmann, Counsel for Appellate Litigation, were on brief for the United States Department of Labor.

Louis B. Butterfield with whom Olafsen & Butterfield was on brief for intervenor, Robert Michaud.

Before LYNCH, Circuit Judge,
CAMPBELL and BOWNES, Senior Circuit
Judges.

LEVIN H. CAMPBELL, Senior Circuit
Judge.

This is a petition to review an order of the United States Department of Labor Administrative Review Board (the "Board"). *See* 49 U.S.C. § 31105(c). The Board has ruled that BSP Trans, Inc. ("BSP") violated the Surface Transportation Assistance Act of 1982 ("STAA") by terminating one of its employees, Robert Michaud, in retaliation for his having complained to his BSP supervisors about BSP's failure to comply with federal transportation safety regulations. BSP contends that the Board erred by rejecting the factual findings of the U.S. Department of Labor administrative law judge ("ALJ") who initially heard the case. BSP also contends that the STAA does not protect the purely internal complaints Michaud claims to have made. We reverse the Board's order, holding that the Board was obligated under applicable regulations to uphold the ALJ's findings, because these findings were supported by substantial evidence on the record as a whole.

## I.  BACKGROUND

BSP is a trucking company that transports general freight as a contract carrier in intrastate and interstate commerce. The company is based in New Hampshire and operates five terminals in New Hampshire, Vermont, and Maine. Michaud was employed at BSP's terminal in Westbrook, Maine between July and December, 1993. His employment ended on December 23, 1993, when he was terminated, ostensibly for photocopying confidential BSP documents and being evasive when his supervisors confronted him about it. Michaud claimed this reason was a pretext, and that the real reason for his termination was his complaints to management that BSP was requiring its truck drivers to exceed the hours permitted under U.S. Department of Transportation ("DOT") regulations. Michaud insists he photocopied company documents only to document these violations.

In January, 1994, Michaud requested that the Occupational Safety and Health Administration ("OSHA") investigate his termination. OSHA made a preliminary determination that BSP wrongfully terminated Michaud and ordered BSP to reinstate him. BSP objected to the order and requested a *de novo* hearing. A hearing was held before an ALJ from the U.S. Department of Labor.

Michaud's testimony before the ALJ was widely discrepant from that of his supervisors. The ALJ resolved these discrepancies and related credibility issues in favor of the supervisors and against Michaud. The critical issue in the present petition is whether, in light of a regulation making the ALJ's findings conclusive if supported by substantial evidence on the record as a whole, the Board was entitled to reject those findings. We begin by summarizing the testimony of the key witnesses. We then recount the different findings of both the ALJ and the Board. Finally, we discuss the appropriateness of these findings and their legal effect.

### A.  Testimony Before the ALJ
*Robert Michaud's Testimony*

Michaud testified that he began working as a commercial truck driver at the Westbrook terminal in July, 1993. In September, he read one of BSP's documents which referred to U.S. Department of Transportation ("DOT") regulations limiting the number of consecutive and weekly hours commercial truck drivers could operate. He testified to being concerned that he and BSP were violating them. He said he mentioned the regulations to fellow driver Jeffrey Labrecque, who said BSP was exempt from the regulations based on "the Railroad Act of New Hampshire."

According to Michaud, he then asked a state trooper about the regulations. The trooper advised Michaud to contact the DOT to see if the regulations applied to BSP, and if so, to copy documents detailing Michaud's hours. Michaud testified that he next contacted the DOT and spoke to a woman he identified only as "Susan." Susan told him BSP drivers could be on-duty only 12 hours per day and 60 hours per week. Michaud said that he did not tell anyone at BSP about

his conversations with Susan or the state trooper.

In mid-October, Michaud received his three-month performance evaluation from BSP. According to Michaud, his overall evaluation was "definitely above average," but his rating for quantity of work was "satisfactory." When Michaud asked night supervisor Glen Osterberg why his rating was merely "satisfactory," Osterberg is said to have replied that it was because, unlike other BSP drivers, Michaud was unwilling to drive extra runs on Saturdays. Michaud stated that while he would welcome the additional income from extra Saturday runs, he was already working the maximum weekly hours permitted by DOT regulations. Osterberg responded that the regulations did not apply to BSP. The next day, Michaud contends he had a similar conversation with terminal supervisor Alex Kasny, and Kasny also stated that BSP was exempt from the regulations and that Michaud should "get it out of [his] mind."

Michaud testified that he then went to safety director Ed Paul and described what he called "a vicious cycle": BSP day trucks often returned late to the terminal, causing the night trucks to leave late. Because the night truck drivers' on-duty time included time spent at the terminal waiting to be dispatched, the effect of the day trucks arriving late was that the night truck drivers either had to exceed the speed limit or end up working more hours than were permitted by DOT regulations.

Then, sometime in late October or early November, Michaud says he spoke to BSP president Jack Law. Michaud explained the "vicious cycle" to Law and stated that it was illegal to require drivers to work more than 60 hours per week. Law listened and smiled, but quickly changed the subject. Michaud then raised the issue with day supervisor Dave Andrews, who told Michaud that he would discuss the matter with acting terminal manager Michael Greany.

Around this time, Michaud began copying his and other drivers' time cards and manifests to document what Michaud· believed were BSP's violations. On at least one other occasion, another BSP driver gave Michaud

his manifest for copying. Michaud stated that it was not unusual to photocopy one's own time card in the presence of BSP management, as drivers typically kept copies in case they were paid for fewer hours than they had actually worked. He also claimed that occasionally he would do favors to other drivers by photocopying their time cards for them if he was already at the copy machine. He did not consider the time cards to be confidential.

Just before Thanksgiving, Kasny brought Michaud and fellow truck driver Larry Roy into his office. He asked Michaud and Roy to make local runs in the afternoon in addition to their normally scheduled runs. Michaud testified that, with Roy present, he told Kasny that those hours would be illegal and he would not do it. Kasny responded, according to Michaud, that BSP was not subject to the DOT regulations and Michaud should "get it out of [his] thick skull about ... illegal hours." Michaud complied, but began looking for other jobs.

According to Michaud, approximately a week before Christmas, he repeated his complaints to Greany, who replied, "Well, it was nice knowing you. Have a good holiday." Michaud interpreted this comment to mean that he was about to be fired.

On December 23, 1993, Michaud arrived at the terminal early in the morning and began copying other drivers' time cards to document their hours. Fellow employees Dane Evoga and Dan Vaughn were already at the copy machine, but the machine had jammed. Michaud fixed the paper jam, made copies of the time cards, and left the room.

Later that morning, Osterberg told Michaud to punch in and go see Kasny. Kasny asked both Michaud and Osterberg to come into his office. Kasny asked Michaud if he had been copying other drivers' time cards and manifests. Michaud said yes, but mentioned that he did it as a favor to other drivers, when he happened to be ahead of them in line at the copy machine. Michaud testified, "In other words, I was avoiding telling them the whole thing. I· was doing those without permission, the other ones." When Kasny asked if Michaud copied other

drivers' time cards without their permission, Michaud remained silent because, as he stated, "now they were pinning me down ... [a]nd I figured if I revealed that, I'm fired." Michaud testified that he didn't believe either Kasny or Osterberg ever asked him why he was copying the documents, and he did not tell them. Michaud was told that he was terminated. *Dan Vaughn's Testimony*

Vaughn was one of the dock workers who was using the copy machine when Michaud entered the terminal's office on December 23rd. Vaughn testified to the following: Michaud and another driver, Jeffrey Taylor, entered the office sometime between 3 a.m. and 4 a.m. Michaud was talking about "making a file to cover his ass." Taylor opened the wooden file cabinet where the manifests were stored and removed a stack of documents. The two men also retrieved time cards from the drivers' room outside the office. Michaud began to photocopy the documents and asked Taylor to stand look-out at the door to the office. This conduct lasted approximately 15–20 minutes.

During this time, Vaughn was sitting at a desk on the other side of the office. Michaud and Taylor chatted with Vaughn and generally made no effort to hide from him what they were doing. At one point, Vaughn walked over to the copy machine and recognized the time card of employee Pete Chiasson. Among the stack of documents he saw Michaud copying, that was the only document he specifically identified.

Vaughn believed that what Michaud and Taylor had done was "wrong," and he went to Andrews later that morning. Vaughn testified that he told Andrews what he had witnessed, stating, "I didn't think it was right, you know, employees in there filing through stuff and copying the manifests ... copying other people's time card[s]."

*Dave Andrews' Testimony*

Andrews testified that he understood Vaughn to say that Michaud alone did the copying, with Taylor merely assisting him by acting as look-out. Andrews stated that he then alerted Kasny. However, he told Kasny only about Michaud's involvement, because, according to Andrews, the manifests were Andrews' primary concern and Vaughn had

reported that only Michaud was doing the copying. He knew that drivers often copied their own manifests, but believed that he ought to advise Kasny that Vaughn had seen Michaud copying "a stack of manifests."

Andrews further testified that Michaud had previously mentioned to Andrews that he wanted to make more money and once asked him, "Is there any way to get these day drivers in here any earlier?" However, according to Andrews, Michaud had never mentioned to him excessive hours or the DOT hours of service regulations. During Michaud's employment, Andrews was aware that drivers were working long hours and not keeping logs, and he knew that might violate DOT regulations. The issue, however, never came up in conversation with Michaud, and Andrews never discussed it with his superiors.

*Alex Kasny's Testimony*

Kasny testified that, at approximately 7:30 a.m. on December 23rd, Andrews approached him and stated that Vaughn had witnessed Michaud making copies of time cards and other paperwork in the office. When Andrews said that was all he knew, Kasny summoned Vaughn to his office.

Vaughn repeated to Kasny that he had witnessed Michaud copying time cards and other paperwork, and that file drawers in the office had been opened and files were laying out. Kasny assumed the "other paperwork" meant manifests, since they would provide a quick, easy way of getting information about multiple customers at once. Manifests, Kasny explained, include information regarding BSP's customers, all the trucking companies with which BSP has agreements, what freight is being transported, and, by inference, BSP's rate structures. Manifests do not, however, directly state BSP's rates; that information is printed on BSP's bills of lading, which were also located in the file cabinet.

Kasny then called Greany. He told Greany that he was concerned because Michaud had been caught copying manifests. Greany told him he would call back. About an hour later, Greany called back and told Kasny to bring Michaud and a witness into

Kasny's office and ask Michaud directly whether he had been making copies of time cards and manifests.

Michaud arrived for his shift at approximately 5:00 p.m. Kasny asked Osterberg and Michaud into his office and closed the door. He asked Michaud, "Did you make any photocopies of time cards and/or manifests?" Michaud responded, "Who told you this? Did the dock guys tell you this? They've been out to get me." Kasny repeated his question a total of six times. Each time, Michaud stated only that he had copied his own time card, and Larry Roy's, at Roy's request. Kasny then told Michaud that he had been seen copying time cards and manifests, and that he would be terminated. He asked for Michaud's fuel card and toll cards and asked Michaud to leave the premises.

Kasny called Greany to "let him know of the conversation that I had, and that Mr. Michaud was—was, indeed, dismissed from employment." Because he was relatively new to his management position, Kasny did not believe he had the authority to terminate employees, "unless it was just an out-and-outright blatant type incident." He stated that while he recommended to Greany that Michaud be terminated, the ultimate decision was Greany's.

Kasny testified that, prior to Michaud's termination, Michaud never complained to him about DOT hours of service regulations. Michaud did not mention the regulations or his hours during Michaud's mid-October performance evaluation. Rather, the only topic discussed during the meeting was whether Michaud was entitled to more than the 50-cent-per-hour raise he was told he would receive. Michaud also said nothing about illegal hours or DOT regulations when Kasny confronted him about the copying of documents. While Kasny himself was familiar with the regulations from his own days as a truck driver, he insisted that the first time he heard allegations that BSP violated them was several months after Michaud was terminated.

### Michael Greany's Testimony

Greany testified that, on December 23rd, he was in Londonderry, New Hampshire. He received a phone call from Kasny, who told him that Michaud had been caught copying time cards and manifests. Greany was not particularly concerned about copying of time cards, because he knew that such practice was commonplace among BSP drivers. He was quite concerned, however, about the copying of manifests because he viewed those documents as potentially valuable to competitors. He thought of a conversation he had with Michaud in late October or early November in which Michaud was upset that he had not received a raise that he thought he had been promised. Greany immediately became concerned that Michaud was copying the documents for profit.

Kasny asked Greany what he should do, and Greany told Kasny he would discuss the matter with company president Jack Law and get back to him. Greany conferred with Law and telephoned Kasny. During this second conversation, Kasny also mentioned that the drawer to the file cabinets was open when Michaud was copying. Greany told Kasny that while Michaud's conduct required "instant dismissal," Kasny should try to find out exactly what documents had been copied.

Later that afternoon, Kasny called Greany to report what had happened when he confronted Michaud. Kasny reported that Michaud had been evasive and very uncooperative, but ultimately admitted to photocopying time cards (both his own and others') and manifests. At that time, Greany did not yet think that Michaud had actually been terminated, so he told Kasny to "let him go."

Greany testified that throughout Michaud's employment he was unaware of the DOT hours of service regulations, even though it was his responsibility to be aware of them. He stated that Michaud never once mentioned to him hours of service or expressed "any kind of regulatory concerns." Approximately a week before Christmas, Michaud mentioned to him that the company lost money when the day trucks arrived late and stated, "it's tough to make up for that because of the type of schedules that they're operating on." Greany simply replied, "We can't control the shipping community. We get them back as soon as we can, and we go out." The day Michaud was terminated,

Kasny did not report that Michaud had raised these issues, and Greany was not even aware of the DOT regulations at that time.

*Jeffrey Taylor's Testimony*

Jeffrey Taylor testified that he never assisted Michaud copy documents on December 23rd or any other day. He stated that on December 23rd, he was not even present at the Westbrook terminal because he was receiving workers' compensation at the time. During the time that he was receiving workers' compensation—from December 1, 1993, to February 26, 1994—he came to work only twice, December 13 (he believed) and February 22.

## B. The ALJ's Decision

In September, 1996, the ALJ issued a recommended decision ruling that Michaud's termination did not violate the STAA. The ALJ's reasoning was straightforward—that Michaud did not register "internal complaints cognizable as protected activity under the Act." We quote liberally from the ALJ's decision, omitting only citations to the record:

First, there is no corroboration whatsoever for Mr. Michaud's testimony. This lack of corroboration is troubling, given that complainant contends that at least one driver, Larry Roy, was present during the ... conversation with Kasny in late November 1993. Nor was "Susan" from DOT further identified or called to testify, Mr. Michaud's testimony stands alone and directly contradicted by three witnesses. Kasny, Andrews, and Greany denied that the hours of service subject came up, although they recalled a number of occasions when complainant discussed the "vicious cycle." Other discrepancies indicate that complainant's memory of the events is perhaps more as he wishes they had occurred, rather than how they actually occurred. For example, Dave Andrews recalls telling complainant that his desire to have the day shift trucks come in earlier was not workable because the customers dictate the volume of freight. Greany echoed this fact of business life. Yet Mr. Michaud testified that Andrews agreed with him about bringing the day trucks in earlier. Another discrepancy is that Kasny and Andrews deny talking to complainant about the New Hampshire Railway Act, but complainant may have talked to another driver, Jeffrey Labrecque, about it.

Second, Mr. Michaud's own testimony was extremely vague and often tangential. He spoke haltingly about key events, and was frequently unable to remember dates, and who said what. It is unnecessary to determine whether his lack of clarity stems from conscious dissembling, for Mr. Michaud himself admitted that his mental state causes his mind to wander and lose focus. As a result, he is not a reliable witness.

Third, complainant's statements about the "vicious cycle" and getting his run accomplished centered primarily on his extra job assignments and concern with making more money, rather than on perceived safety or hours violations.

Finally, the fact that Mr. Michaud kept his alleged early contacts with the DOT and state trooper a secret from BSP management suggests that he either did not make those contacts at all or that he was not really seriously concerned about management making a change. In this regard, I find complainant's testimony contradictory and not at all reconcilable. Complainant testified that *before* his October review, he instituted a conversation with a state trooper about the hours of service rules; again, he was very vague about the when, where and what of these contacts. However, he claims that he did not see the document that "jogged his memory" and "concern" about the hours of service rules until the October review itself. There is no explanation for why, if he had no concern about the hours of service violation until the review, he supposedly called the DOT and stop[ped] a state trooper *before* that time. Even assuming he telephoned DOT and contacted the trooper after the review, it is undisputed that he did not disclose the company's name to state or federal authorities, nor tell BSP about the contacts. A reasonable inference is that his level of alleged concern was somewhere between minimal and none. The evidence leaves it very uncertain whether Mr. Michaud actu-

ally contacted DOT or spoke to a state trooper.

In short, I find that Mr. Michaud was engaged primarily in a struggle to get his point across to Alex Kasny, who was simply too new in his job to handle the situation well. while this may have been poor management, along with an interpersonal struggle, it was not about DOT hours of service violations. Rather, the record convinces me that the hours-of-service issue was incidental and, more likely than not, after the fact of discharge. For these reasons, I conclude that the complainant has not shown by a preponderance of the evidence that he registered internal complaints cognizable under the Act.

The ALJ therefore recommended that Michaud's claim of discrimination be dismissed, and Michaud objected to this recommendation before the Board.

### C. The Board's Decision

On January 6, 1997, the Board rejected the ALJ's recommended decision and ruled that Michaud's firing violated the STAA. Specifically, the Board concluded that Michaud's conduct was protected by the STAA and BSP's stated " 'legitimate' reason for firing Michaud [was] not credible."

The Board initially acknowledged its duty under STAA Rule 109(c)(3) to accept as conclusive the ALJ's findings that were supported by substantial evidence. However, the Board stated, "some of the ALJ's factual findings are not supported by the record evidence and consequently we make corrected findings of fact."

Most importantly, the Board credited Michaud's testimony that he had complained to Osterberg, Kasny, Paul, Andrews, and Law about excessive hours under the DOT regulations. The ALJ had questioned whether these conversations had ever taken place and stated that Michaud's "statements about the 'vicious cycle' and getting his run accomplished centered primarily on his extra job assignments and concern with making more money, rather than on perceived safety or hours violations." The Board decided that this statement by the ALJ was not supported by substantial evidence, citing Greany's testi-

mony that Michaud mentioned the late departure of night drivers out of concern for the company's money, not Michaud's own money. The Board reasoned that "if Michaud only wanted to earn more money and did not have safety concerns, he would have agreed to make extra runs on Saturday."

The Board also rejected the ALJ's finding that "the person who made the decision, and the only person with authority to make the decision, to discharge Mr. Michaud was Michael Greany ... [and] there is no reliable evidence that Greany knew about any 'hours of service' complaints by complainant." According to the Board, the record showed that Kasny was "instrumental in the firing," and alternatively, that Greany "had actual knowledge of Michaud's complaint about the 'vicious cycle' and in light of that knowledge he also knew that copies of time cards could substantiate Michaud's suspicion of time in service violations."

Moreover, the Board disagreed with the ALJ about Michaud's alleged conversations with the state trooper and "Susan" from the DOT. The ALJ found that Michaud's failure to mention these conversations to his BSP supervisors suggested that the conversations had never occurred at all. The Board responded, "[i]n light of BSP's failure to take corrective action when the violation was brought to it's [sic] attention ... [c]ommon sense dictates that Michaud would want to have documentary evidence of a violation before filing a complaint and would not want his employer to know about the complaint until it was filed."

The Board ultimately found that

[BSP's] stated "legitimate" reason for terminating Michaud, [i.e., that he was caught copying time cards and manifests,] is not credible because the company did not treat the manifests as confidential and the information on manifests would reveal little to a competitor. We further find that Michaud established by a preponderance of the evidence that BSP discharged him for engaging in the protected activity of gathering evidence that BSP suspected would be used to support a complaint about hours of service violations.

The Board remanded the cause to the ALJ for a recommendation on damages. Five months later, the ALJ recommended that Michaud be awarded damages for back pay, front pay, health insurance benefits, compensatory damages in the amount of $75,000, as well as attorneys' fees, costs, and equitable relief. This recommendation was adopted by the Board with only minor alterations. BSP then brought this petition seeking review of the Board's final order.

## II. DISCUSSION

We review the Board's final order according to the standards of the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq.* We must affirm the Board's decision unless its legal conclusions are arbitrary, capricious, or otherwise not in accordance with law, or if its factual findings are unsupported by substantial evidence. *See* 5 U.S.C. § 706(2); *Clean Harbors Envtl. Serv., Inc. v. Herman,* 146 F.3d 12, 19 (1st Cir.1998).

Section 405(a)(1)(A) of the STAA provides in relevant part:

(a) Prohibitions. (1) A person may not discharge an employee regarding pay, terms, or privileges of employment because—

(A) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety regulation, standard, or order, or has testified or will testify in such a proceeding ...

49 U.S.C. § 31105(a)(1)(A).

■ We have held that, in order to state a claim of retaliatory discharge under this section, the complainant must demonstrate that he or she engaged in a protected activity, that he or she was subjected to adverse employment action, and that a causal connection existed between the protected activity and the adverse action. *See Clean Harbors,* 146 F.3d at 21. If a complainant makes out a prima facie case, the employer may rebut that showing with evidence of a legitimate, non-retaliatory reason for the adverse employment action. *See id.* The burden then shifts back to the complainant to prove that the proffered reason is actually a pretext for unlawful retaliation. *See id.; cf. Texas*

*Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)(setting forth the burden-shifting framework).

BSP contends that the Board (1) erroneously failed to defer to the ALJ's factual findings and (2) incorrectly interpreted the STAA to include Michaud's conduct. We address these arguments in turn.

### A. The Board's Treatment of the ALJ's Factual Findings

■ The Board rejected the ALJ's finding that the BSP officials who terminated Michaud were unaware of his complaints about the maximum hour regulations. The Board also rejected the ALJ's finding that the real reason for Michaud's termination was his copying manifests and being evasive when confronted about this allegedly improper conduct. BSP now argues that the Board erred in ignoring the ALJ's findings on these matters. We agree.

The regulations promulgated pursuant to the STAA require the Board to treat as conclusive an ALJ's factual findings "if supported by substantial evidence on the record as a whole." 29 C.F.R. § 1978.109(c)(3) ("STAA Rule 109(c)(3)"). Hence, while we are authorized to review only the Board's decision, *see* 49 U.S.C. § 31105(c), in doing so

we must also determine whether under the STAA Rules [the Board] was bound by the ALJ's findings of fact. If there was substantial evidence to support the ALJ's findings, then the [Board's] refusal to treat them as conclusive was contrary to STAA Rule 109(c)(3) and [its] decision must be set aside.

*Castle Coal & Oil Co. v. Reich,* 55 F.3d 41, 44 (2d Cir.1995).

We need, then, to review the record in its entirety, in order to determine if the ALJ's findings were or were not supported by substantial evidence. If they were, then the Board's rejection of these findings constitutes legal error that may warrant reversal. *See Air America, Inc. v. Director, Office of Workers' Compensation Programs,* 597 F.2d 773 (1st Cir.1979) ("It is within our authority, in reviewing the Review Board's decision for

legal error, to reverse the Board if it erred in evaluating the evidence underlying the ALJ's finding not to constitute substantial evidence."); *Prolerized New England Co. v. Benefits Review Board,* 637 F.2d 30, 35–36 (1st Cir.1980) (same).[1] If, however, the ALJ's findings were not supported by substantial evidence, we must then also satisfy ourselves that the Board's own findings were based on substantial evidence.

■ "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939) (internal quotation marks and citation omitted). Substantial evidence does not require, however, such proof as would foreclose the reasonable possibility of an alternate conclusion. It is, therefore, possible for the Board's findings to conflict with the ALJ's but for each set of findings to be supported by substantial evidence. In such a case, the ALJ's findings would prevail, given STAA Rule 109(c)(3). *See Brink's, Inc. v. Herman,* 148 F.3d 175, 179 (2d Cir.1998) ("Thus, if we determine that the ALJ's decision was based on substantial evidence, we must reverse the [Board] and order that the ALJ's decision be adopted; this is so even if the [Board's] decision was also based on substantial evidence.").

The crux of the ALJ's recommended decision was that there was no connection between Michaud's alleged complaints about the DOT regulations and his termination. We think that this finding was supported by substantial evidence on the record as a whole, with the result that the Board's decision must be set aside. Specifically, substantial evidence supported the ALJ's finding that

> while [the handling of Michaud's complaints] may have been poor management,

along with an interpersonal struggle, [the complaints were] not about DOT hours of service violations. Rather, the record convinces me that the hours-of-service issue was incidental and, more likely than not, after the fact of discharge.

According to Michaud, he complained about illegal hours to Osterberg, Kasny, Paul, Law, Andrews, Kasny (again), and finally to Greany. However, as the ALJ noted, not a single witness corroborated this part of Michaud's testimony. Osterberg, Paul, and Law were not called as witnesses. Nor was Larry Roy, whom Michaud testified was present when, just before Thanksgiving, Michaud says he told Kasny that his hours violated the DOT regulations and Kasny responded, "Get it out of your thick skull about … illegal hours."

In fact, Kasny, Andrews, and Greany each testified that excessive hours or the DOT regulations never came up in their conversations with Michaud. Kasny stated that the only employment issue Michaud ever discussed with him was whether Michaud was entitled to a raise. Andrews also stated that Michaud mentioned that he wanted to earn more money. According to Andrews, the only discussion even remotely related to hours of service was Michaud's stray comment one day, "Is there any way to get these day drivers in here any earlier?" Andrews testified that, though Andrews was aware of the DOT regulations, Michaud never directly mentioned them to him, and he did not think Michaud's comment was about them. Greany's testimony was similar to that of Andrews. He testified that Michaud never once mentioned to him any "regulatory concerns" or excessive hours of service. In fact, Greany stated that, until OSHA began its investigation after Michaud's termination, he was entirely unaware that the regulations even existed.

While a fact finder could have believed Michaud and disbelieved the other witnesses,

---

1. *Air America* and *Prolerized New England* each involved claims for compensation and benefits under the Longshoremen's and Harbor Workers' Act, 33 U.S.C. § 901 *et seq.* Under that Act, the recommended decisions of ALJs are reviewed by the Benefits Review Board, which must treat as conclusive "the findings of fact in the decision under review … if supported by substantial evidence in the record considered as a whole." *Id.* at § 921(b)(3); 20 C.F.R. § 802.301(a). We find this rule, in all practical effect, indistinguishable from STAA Rule 109(c)(3).

we are unable to say that a reasonable mind could not also credit the testimony of Kasny, Andrews, and Greany. The ALJ had the advantage of seeing and hearing the witnesses. She specifically found Michaud not to be a "reliable" witness. The others' testimony was adequate to support the conclusion that Michaud never complained to them about excessive hours or other violations of the DOT regulations. If Michaud never made such complaints, his discharge could not have been based on them. The Board, of course, disagreed, discrediting these witnesses' testimony by stating "if Michaud only wanted to earn more money and did not have safety concerns, he would have agreed to make extra runs on Saturday." The unstated inference, of course, is that if Michaud's "vicious cycle" comments were not merely about money, then they must have been about excessive hours.

Even if this is one possible inference, it is scarcely so apparent as to permit the Board to reject, on a cold record and its own speculation, the ALJ's credibility determinations. It is the ALJ's usual province to make determinations about witness credibility. *See, e.g., Acme Tile & Terrazzo Co. v. NLRB*, 87 F.3d 558, 561 (1st Cir.1996). While these determinations may be overturned if unsupported, the Board is not entitled to reject them without stronger evidence of mistake than this record demonstrates. To be sure, where the Board and the ALJ agree as to the existence of a particular fact, the Board may draw different inferences from that fact, *see Kallmann v. NLRB*, 640 F.2d 1094, 1099 (9th Cir.1981), but that is not what occurred here. Here, several witnesses presented diametrically opposed testimony as to a particular

fact, and the ALJ has found one version credible and the other not credible. The effect of STAA Rule 109(c)(3) is that the Board cannot simply disagree, unless no reasonable mind could accept as adequate the relevant evidence on which the ALJ's findings rested.[2]

That threshold was not met here. Except for Michaud, no witness testified to Michaud's having complained of illegal hours or the DOT regulations to BSP management, or to anyone else for that matter. And, given Michaud's admitted memory problems and often erratic testimony, reasonable minds could have concluded that Michaud was either not telling the truth or remembering events as he wished they had been, rather than as they were.

### B. The Board's Interpretation of the STAA

■ BSP argues that Michaud cannot invoke the protection of the STAA because, at the time of his termination, he had not "filed a complaint or begun a proceeding" within the meaning of 49 U.S.C. § 31105(a)(1)(A). The ALJ determined that Michaud "ha[d] not shown by a preponderance of the evidence that he registered internal complaints cognizable under the Act." Because we hold that the Board was obligated to accept the ALJ's finding that Michaud never actually complained to his supervisors about DOT hours of service violations, we need not consider whether this conduct would have been protected. Obviously, an employer cannot retaliate on the basis of complaints never made.

The Board, however, also stated,

Board accepted the ALJ's statement of facts but disagreed with the ALJ's quasi-legal conclusion that the facts demonstrated a "pattern of delay" on the part of the employee. *Yellow Freight*, 8 F.3d at 986. In *Roadway Express*, the Board agreed with the ALJ's findings but said it could accept them and yet still reach a contrary legal conclusion. *Roadway Express*, 929 F.2d at 1066. The present case is significantly different. Here, the Board did not claim that it could accept the ALJ's credibility determinations and still conclude that Michaud complained to his supervisors about excessive hours under the DOT regulations. Rather, as we explain *infra*, this fact is the *sine qua non* of Michaud's claim.

---

**2.** Michaud defends the Board's action, citing the Second Circuit's statement that "[t]he [Board] may disagree with an ALJ's conclusions and review the record independently to assess evidence not adequately considered at the hearing." *Yellow Freight Systems, Inc. v. Reich*, 8 F.3d 980, 986 (4th Cir.1993). However, careful review of *Yellow Freight* and the case the Second Circuit cited for this proposition, *Roadway Express, Inc. v. Dole*, 929 F.2d 1060, 1066 (5th Cir.1991), reveals that this statement is inapplicable here. Neither *Yellow Freight* nor *Roadway Express* involved instances where the Board simply rejected the ALJ's credibility determinations in order to make contrary findings. In *Yellow Freight*, the

[e]ven if we were to conclude that Michaud's internal complaints did not constitute protected activity, there is no doubt that Michaud engaged in protected activity when he copied time cards and his own manifest as evidence of hours of service violations. Gathering evidence to be used to support a protected complaint is itself protected under whistle blower provisions. While we do not dispute that the STAA protects some acts of evidence-gathering to be used to support a protected complaint, we reiterate that the Board was bound to accept the ALJ's finding that *there was no complaint to support.* And, if Michaud never complained to his supervisors about DOT regulations, they would have little reason to think that his photocopying time cards and manifests was an attempt to document BSP's violations. Both Kasny and Greany testified that they believed the reason Michaud was copying documents was that manifests contained information that was potentially valuable to BSP's competitors.

 The manifests did, in fact, provide information about the cargoes BSP carried, although the novelty of this information and the extent to which BSP treated it as confidential were disputed. In any case, the actual utility of this information is not conclusive here. As a panel of this court recently noted, the scope of protection afforded under the STAA depends on whether the employee's conduct was "sufficiently definite to put [the employer] on notice that he was engaging in protected activity." *Clean Harbors,* 146 F.3d at 22. The panel recognized that "[c]learly there is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the STAA." *Id.* We have no occasion to identify that exact locus here. We simply hold that in the absence of Michaud's actual complaint to management, he cannot invoke the protections of the STAA based merely on his copying of company papers for the undisclosed purpose of documenting the company's perceived regulatory violations. We note that Michaud himself testified that, at the conference at which Kasny indicated he was dismissed, Michaud nonetheless never disclosed his purpose for copying the company papers, and there is no evidence that such disclosure was made at another time before discharge.

Because the ALJ's supported factual findings lead to the conclusion that Michaud did not engage in protected activity, we need proceed no further. *Clean Harbors,* 146 F.3d at 21.

The decision of the Board is *reversed* and *remanded* with instructions to enter judgment on behalf of the petitioner.