**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 19 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES L. DALTON,

    Petitioner,

    v.

UNITED STATES DEPARTMENT
OF LABOR,

    Respondent,

---

COPART, INC.,

    Intervenor.

No. 01-9535

(ARB No. 01-020)

(Petition for Review)

---

**ORDER AND JUDGMENT** *

---

Before **BRISCOE** , **HOLLOWAY** , and **HARTZ** , Circuit Judges.

---

    Petitioner Charles Dalton seeks review of an order of the United States

Department of Labor Administrative Review Board (the Board) dismissing his

complaint against Copart, Inc., his former employer and the Intervenor in this

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

case. Petitioner contends that Copart violated the Surface Transportation Assistance Act of 1982 (STAA) by firing him as a truck driver. The STAA prohibits terminating an employee for refusing to operate a vehicle when that employee "has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's unsafe condition." 49 U.S.C. § 31105(a)(1)(B)(ii).

An administrative law judge (ALJ) agreed with Petitioner and ordered his reinstatement with back pay. On appeal the Board rejected the ALJ's decision and dismissed Petitioner's complaint. An applicable STAA regulation required the Board to adopt the ALJ's findings if those findings were supported by substantial evidence on the record as a whole. *See* 29 C.F.R. § 1978.109(c)(3). Because substantial evidence supported dispositive findings by the ALJ, we reverse the Board's order.

I.    **Background**

Petitioner worked as a salvage hauler for Copart from January 11, 1999, until March 4, 1999, when Copart terminated him for refusing to drive his truck. His job was to drive one of Copart's "haulers" (a large truck with the capacity to hold three wrecked vehicles on its decks while towing a fourth vehicle), load wrecked vehicles onto the hauler, return the vehicles to Copart's facility, and unload them. Copart then auctioned the wrecked vehicles on behalf of insurance companies.

To load a vehicle onto the hauler, the driver operates controls at the side of the truck that raise and tilt the hauler's deck by means of a hydraulic ram. With these controls the driver can also operate three hydraulically driven winches. Each winch is attached to a cable. The driver attaches the cable to the vehicle he is loading, tilts the deck of the hauler using the ram, and, using the winch attached to the cable, pulls the vehicle onto the deck.

The condition of the winches, ram, and cables on Petitioner's truck is central to this case. On the morning Petitioner was terminated, his truck was at the Frontier International repair shop undergoing brake repairs. Petitioner arrived at Frontier at about 7:45 a.m. to pick up the truck but was told that it would not be ready until 10 a.m. He then drove to Copart and spoke with his supervisor, Dan Cupp, Copart's yard manager. Petitioner testified that he informed Cupp that the brakes had not yet been repaired, and that no work had been done on the cables or the ram and winches, which had been reported to be leaking. According to Petitioner, he told Cupp that the truck was unsafe and had been "pushed to the limit," Tr. 96, reminded him that the cables had previously been designated for replacement, and expressed concern that the cables could "snap anytime." Tr. 105. Cupp replied that only the brakes would be repaired that day, and told Petitioner that he could either clean out cars in the yard or go home and

wait for the brake repairs to be completed. Petitioner decided to return to Frontier to wait for the truck.

On the way to Frontier, he stopped at a truck stop and called Craig Gille, Copart's General Manager. Petitioner testified that he told Gille of his concerns that the ram, winches, and cables would not be repaired before he was dispatched, and Gille replied that he would discuss the matter with Cupp and get back to him.

Petitioner arrived at Frontier shortly after 10 a.m. to determine the status of the repairs. When the work had not been completed by 10:45 a.m., he went home and made an appointment to have the windshield on his personal vehicle repaired. At 12:30 p.m. Gille called Petitioner at home and told him that the brakes had been repaired and the truck was ready to drive. Petitioner's version of the remainder of the conversation was as follows: He asked Gille whether the leaks or cables had been repaired. Gille replied that they had not, but were scheduled to be repaired in a few days. Gille also said that, according to Cupp, the leaks and cables were not safety concerns. Petitioner countered that the truck was "extremely dangerous" without those repairs. Tr. 101. Gille told Petitioner to return to work and drive the truck or he would be terminated. Petitioner reiterated his concerns about the safety of the cables and the leaks, and also told Gille that he had scheduled someone to come to his house that afternoon to repair his personal vehicle. Gille then terminated Petitioner for refusing to drive the

truck. (Copart's witnesses testified that Petitioner did not raise safety concerns prior to his termination.)

II. **Prior Proceedings**

Petitioner filed a complaint with the Secretary of Labor, alleging that he was fired in violation of the STAA because his refusal to drive the truck was based on a reasonable apprehension of serious injury as a result of the truck's unsafe condition. *See* 49 U.S.C. § 31105(a)(1)(B)(ii). After an initial investigation the Secretary issued findings concluding that Copart had not violated the STAA in discharging Petitioner. Petitioner objected to the findings and requested a hearing under 49 U.S.C. § 31105(b)(2)(B).

A one-day de novo hearing was then held before an ALJ on May 10, 2000. Following the hearing, the ALJ issued a Recommended Decision and Order (RDO) concluding that Petitioner's termination violated the STAA. Specifically, the ALJ found that Petitioner had a reasonable apprehension of serious injury due to the unsafe condition of (1) the truck's cables and (2) hydraulic leaks on the truck's winches and ram.

On appeal the Board issued a Final Decision and Order (FDO) reversing the ALJ. The Board concluded that there was not substantial evidence in the record as a whole to support the ALJ's findings that it was reasonable for Petitioner to apprehend serious injury with respect to either the cables or the leaks.

Accordingly, it rejected the ALJ's RDO and dismissed Petitioner's complaint. Petitioner then sought review in this court under 5 U.S.C. §§ 701-706 and 49 U.S.C. § 31105(c).

III.    **Discussion**

A.    The STAA

Under the STAA it is unlawful for an employer to "discharge an employee . . . [who] refuses to operate a vehicle because . . . the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's unsafe condition." 49 U.S.C. § 31105(a)(1)(B)(ii). "[A]n employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting the employee would conclude that the unsafe condition establishes a real danger of accident, injury, or serious impairment to health. To qualify for protection, the employee must have sought from the employer, and been unable to obtain, correction of the unsafe condition." *Id.* § 31105(a)(2).

Thus, to establish a claim under this section, Petitioner must show that (1) he refused to operate his truck because he was apprehensive of an unsafe condition on the truck; (2) his apprehension was objectively reasonable; (3) he sought to have Copart correct the condition; and (4) Copart failed to do so. *See*

*Brink's, Inc. v. Herman*, 148 F.3d 175, 180 (2d Cir. 1998). Elements 1 and 2 are

the only matters that the parties address in their briefs on appeal.

B. Standard of Review

We review the Board's final order in accordance with the standards of the

Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. We must sustain the

Board's decision unless it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," or "unsupported by substantial evidence."

5 U.S.C. § 706(2)(A), (E). *See BSP Trans, Inc. v. United States Dep't of Labor*,

160 F.3d 38, 46 (1st Cir. 1998).

In turn, under STAA regulations the Board must consider the ALJ's factual

findings "conclusive" if those findings are "supported by substantial evidence on

the record considered as a whole." 29 C.F.R. § 1978.109(c)(3). Thus, although

under § 31105(c) of the STAA we are authorized to review only the Board's

decision, in reviewing that decision

> we must also determine whether under the STAA [regulations, the
> Board] was bound by the ALJ's findings of fact. If there was
> substantial evidence to support the ALJ's findings, then the [Board's]
> refusal to treat them as conclusive was contrary to [29 C.F.R.
> § 1978.109(c)(3)] and [its] decision must be set aside.

*Castle Coal & Oil Co. v. Reich*, 55 F.3d 41, 44 (2d Cir. 1995); *accord BSP Trans,*

*Inc.*, 160 F.3d at 46. In other words, "if we determine that the ALJ's decision

was based on substantial evidence, we must reverse the [Board] and order that the

ALJ's decision be adopted; this is so even if the [Board's] decision was also based on substantial evidence." *Brink's, Inc.*, 148 F.3d at 179. (We note that the parties do not challenge the validity of the regulation mandating deference to the ALJ's findings if those findings are supported by substantial evidence. At least one commentator, however, has questioned whether the regulation conflicts with the APA. *See* Ronald M. Levin, *The Year in Judicial Review, 1997-1998*, 51 Admin. L. Rev. 389, 398 (1999) ("Normally, when an agency head and ALJ disagree, the issue is whether the agency head's position rests on substantial evidence. And the STAA provided that judicial review should be in accordance with the APA. It is not clear that an agency can alter this review standard by regulation; indeed, neither the text nor the administrative history of the Secretary's regulation had directly stated an intention of doing so.") (footnotes omitted.) We express no view on the matter.)

We must therefore determine whether substantial evidence supports the ALJ's finding that Petitioner had a reasonable apprehension of serious injury as a result of the truck's unsafe condition. "Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable mind might accept to support the conclusion." *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989) (internal quotation marks omitted). But the determination of whether substantial evidence supports the ALJ's decision "is not

simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it really constitutes mere conclusion." *Id.* (internal quotation marks omitted). Thus, the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

C.    Substantial Evidence

After examining the entire record, we conclude that substantial evidence supports the ALJ's finding that Petitioner had a reasonable apprehension of serious injury with respect to the truck's cables. Since the Board did not adopt this finding, as required by 29 C.F.R. § 1978.109(c)(3), its decision was not in accordance with law and must be reversed. *See BSP Trans*, 160 F.3d at 46; *Castle Coal*, 55 F.3d at 44. We need not consider whether the ALJ's findings regarding the leaks are supported by substantial evidence.

The Board's focus in its FDO was on whether it would have been reasonable for Petitioner to fear danger from the cables. Therefore, we begin with that issue. Petitioner needed to convince the ALJ that a reasonable person could believe that the cables posed a significant danger. *See* 49 U.S.C. § 31105(a)(1)(B)(ii) (employee must prove a "reasonable apprehension of serious injury"); *Yellow Freight Sys., Inc. v. Reich*, 38 F.3d 76, 83 (2d Cir. 1994)

(apprehension of danger can be reasonable even if post-incident inspection shows no safety defect).

Petitioner's evidence on the condition of the cables included (1) a Copart survey of the truck on February 4, 1999 (one month before his termination); (2) his own testimony; and (3) testimony by the two men who replaced the cables the day after his termination. During the survey of Petitioner's truck, Jim Powell, Copart's National Fleet and Safety Manager, inspected the truck, rated its various components according to Copart's rating scale, and made handwritten comments on Copart's "Truck Survey" form. Copart's rating scale is printed on the form: "Rating: 3=Meets Standard in ALL Areas; 2=Generally Good, Needs Some Improvement; 1=Not Meeting Standards, Needs Immediate Attention; N/A=Not Applicable; R=Not Rated During the Inspection." Resp't Ex. 5. Powell assigned a "3" rating to 21 components on Petitioner's truck, a "2" to 4 components, and a "1" to 10 components. He rated the truck's "Winch and Cables" a "2," with the comment "Add T latch to hooks/ #3 winch replace cable." *Id.* Powell testified that his notation "replace cable" meant that the cable should be replaced at the next scheduled 8,000 mile service. He assumed that replacement would occur in one or two months, depending on the truck's driving history. The record contains no mileage figures for the truck, but reveals that apart from the cables, all components that received a "2" rating were repaired on either February 24 or

February 26. The cables were replaced on March 5, the day after Petitioner's termination.

Petitioner testified that the cables needed replacement and could have "snap[ped] anytime." Tr. 105. He explained that under "ideal conditions" a cable can last three months, but that

> when you're hauling salvage vehicles, you're messing with mangled metal. . . . With a job like this, when you're hauling wrecked vehicles, [a cable] could [snap] in three weeks, because . . . there's times where wheels are crunched and frames are bent under. . . . [Y]ou never know what you're picking up from day to day. So they're just pulling against one another, metal against the rope cable, and rope as in wire.

Tr. 103.

He illustrated that point by describing an incident when a cable snapped while he was hauling a wrecked vehicle for Copart. Petitioner testified that on January 20, 1999, two cables on his truck needed replacement, but only one was replaced. That same day the cable that was not replaced snapped:

> I was picking up the very first vehicle. I was pulling it to the top, which [sic] it's under pretty intense pressure. It snapped . . . . As soon as it let go, it came whipping straight back towards me. I hit the ground.

Tr. 104.

Petitioner received corroboration from Bill Vincent and Joey Tipton, the Industrial Splicing Co. repairmen who replaced the cables on Petitioner's truck on March 5. They testified that the cables were in "bad shape," Tr. 63, 80, had "bent

-11-

wires and broken strands and kinked cables," Tr. 63 (Tipton), were "smashed or broken in some places, [with] kinks, burs, broken wires, et cetera," Tr. 78 (Vincent), and were in danger of breaking. Tr. 63, 79. Vincent stated that the cables "could break today [or] . . . two days from now. . . . It could be any time." Tr. 79.

The ALJ credited this evidence, explicitly finding Petitioner, Tipton, and Vincent to be believable witnesses. According to the ALJ, their testimony, coupled with evidence of Copart's February 4 survey, established that the cables were in disrepair on March 4.

The Board rejected the ALJ's finding regarding the condition of the cables. It based its rejection on Copart's evidence and on its own assessment of Petitioner's evidence as incredible. According to the Board, both Petitioner and the ALJ had "fundamental[ly] misunder[stood]" Copart's February 4 survey and rating system, since "[a] '2' rating, such as Powell gave to the winches/cables item, signified that there was no current defect needing repair, but that the item should be dealt with at the next routine maintenance—which usually occurred at 8,000 mile intervals." FDO at 14. The Board pointed to Powell's testimony that while one of the cables had shown signs of wear during the inspection, it was not unsafe.

The Board did not explain, however, why the ALJ was required to credit Powell's testimony. Nor, more importantly, did it explain why Powell's assessment of the cables' condition on February 4 had to hold true on March 4, particularly when (1) Copart failed to produce mileage records for the truck and (2) the fact that the other components rated as "2" had been replaced in late February suggests that the truck had indeed traveled 8,000 miles since Powell's inspection.

As further evidence that the cables were not defective, the Board relied on the testimony of Keith Mitchell, the service manager of the Frontier repair shop, which worked on the truck's winches the day of Petitioner's termination. Mitchell stated that (1) in order to repair the winches it was necessary to remove the cables; (2) it was Frontier's practice to inspect the cables and to notify the customer of any safety problems; and (3) nothing was brought to his attention regarding the cables on Petitioner's truck. But Mitchell did not testify that he personally inspected the cables on the date in question, and he agreed that Frontier does not specialize in cable repair but leaves that "up to the cable specialists." Tr. 231. And again, the Board did not explain why the ALJ was required to believe Mitchell's testimony, which the ALJ found to be "clearly not credible in some areas." RDO at 30.

-13-

As for the testimony of Tipton and Vincent, who were cable specialists and personally inspected the cables shortly after Petitioner's termination, the Board completely discounted their assertions that the cables were in "bad shape," believing that the testimony "properly cannot be given any weight . . . [because] neither of them could recall [Petitioner's] truck." FDO at 15. The Board noted that both had erroneously testified that Petitioner's truck had five cables, when in fact it had only three. We disagree, however, that this error in recall in itself so undermined their credibility that the ALJ could not rely on their testimony that the cables were defective. Although their memories had dimmed regarding the number of cables on Petitioner's truck, evidence at the hearing could reasonably be viewed as explaining how they could still recall the cables' condition. According to Vincent, Petitioner returned to the shop to discuss the condition of the cables shortly after he replaced them, and soon thereafter asked Vincent to write down his impressions of the cables. The record also contains written statements by Vincent and Tipton dated July 1999, which attest to the cables' disrepair.

In its brief on appeal the Board notes an additional weakness in Tipton's testimony, one not addressed in its decision. Tipton testified that the cables on Petitioner's truck had *three* broken wires per cable strand, but he also testified that it is *five* broken wires per cable strand that presents a safety concern. This

-14-

testimony, however, is not necessarily inconsistent with Tipton's conclusion that the cables were dangerous, since Vincent testified without contradiction that broken wires *or* kinks make a cable dangerous, and both repairmen testified that the cables were kinked on the day that they were replaced. In any event, Tipton and Vincent each insisted that the cables were in bad shape.

In short, the Board has failed to persuade us that there was not substantial evidence to support the ALJ's finding that the cables were defective when Petitioner was terminated. The Board erred in rejecting that finding.

As for the dangerousness of defective cables, Petitioner relied in part on his own testimony. Petitioner described the "frightening" incident in January 1999 in which he claimed that a snapped cable had nearly "taken off a limb," and remarked, "I've seen it where people have lost limbs. I've seen it where people have been decapitated with a snapped cable." Tr. 105.

In addition, Tipton and Vincent testified about the dangers of defective cables. Tipton stated that if a cable snapped it could hurt, and possibly kill, a person standing nearby. Vincent concurred, stating that a cable could break and "hurt the driver or anyone behind it." Tr. 79.

This testimony, if believed, is substantial evidence that defective cables are dangerous. The ALJ credited the testimony. The Board, however, did not,

-15-

relying on the testimony of Copart's engineer Powell, and dismissing Petitioner's account of the "snapping cable incident" as "inherently incredible." FDO at 18.

Powell testified that the truck's winches were designed to pull a maximum of 4,800 pounds, while the cables attached to them could pull 15,000 pounds. The Board construed this testimony to mean that "absent significant failure of the cable, the winch would fail under a much lower load than would the cable." *Id.* at 14. The Board's interpretation of Powell's testimony is not , however, inconsistent with the ALJ's conclusion that defective cables are dangerous; indeed, it supports the determination that a "significant" cable failure can pose a danger.

The Board's rejection of Petitioner's account of the "snapping cable incident" was based in part on his failure to provide "details that might have lent credibility to his claim." FDO at 18. But Copart never attempted to impeach Petitioner on this point by asking questions that could have elicited such details. Nor did Copart produce documents that could have confirmed or disproved that a cable had indeed snapped on one of its trucks in January 1999.

The Board's rejection of Petitioner's story was also based on testimony by Powell. According to the Board, Powell stated that the "incident could not have happened as [Petitioner] described it, because when a cable snaps the end attached to the winch would fly back in the direction of the winch—which would

be in the direction of the cab of the truck and not to the side where [Petitioner] claimed to have been standing." *Id*. Powell's actual testimony, however, was more equivocal:

> Q: So if the cable snapped, would the person operating the controls be in any danger of being hit by a snapped cable?
>
> [Powell]: *I have yet to see* a snapped cable like that do that, come back and whip at a person. *It would typically* go straight up and right toward the winch.

Tr. 280 (emphasis added). Moreover, Powell's experience with towing was limited. Although he was an engineer and had five-years' experience designing trucks and equipment for a utility company, he had been employed by Copart for only one year and had never driven a tow truck. Also, he admitted that tow truck drivers do not always lift vehicles in the manner he described, but must also, for example, use the cables to lift bumpers or sheet metal to make a vehicle accessible.

The Board likewise rejected Petitioner's assertion that he had "*seen it where* people have been decapitated with a snapped cable." FDO at 17, 18 (emphasis added). It viewed his statement with "enormous scepticism" since Petitioner failed to provide details or corroboration. *Id.* at 18. But again, Copart failed to seek such details by questioning Petitioner about his claim. More importantly, Petitioner plausibly contends on appeal that he was merely testifying

-17-

that he had *heard* about such incidents occurring, not that he had personally witnessed a decapitation.

In addition, the Board implicitly rejected testimony by Tipton and Vincent that a snapped cable could injure, even kill, a driver or bystander. As previously noted, the Board refused to accord their testimony "any weight" because they were confused about the number of cables on Petitioner's truck. Yet regardless of how the Board viewed the reliability of Tipton's and Vincent's testimony about the *condition* of the cables on Petitioner's truck, their knowledge of the danger from broken cables was not challenged.

Thus, we are unpersuaded that substantial evidence did not support the ALJ's finding that defective cables posed a significant danger.

Finally, with respect to the subjective requirement for relief under the STAA—Petitioner's actual fear that the cables were dangerous—Petitioner testified to that fear. A former coworker, Larry Glass, corroborated Petitioner. Glass testified that he had overheard Petitioner tell his supervisors on March 4 that the truck was unsafe due to its "frayed and worn and kinked" cables. Tr. 30. The ALJ expressly found Petitioner and Glass to be credible witnesses.

To be sure, there is strong impeaching evidence in the record. Despite Petitioner's assertions that he feared danger from the cables, he surprisingly failed to document his concern. Copart drivers are required to list all vehicle

defects on a Driver's Vehicle Inspection Report (DVIR) form and submit the form

at the end of each shift. Yet his reports never expressed any concerns about the

cables, despite his reports of problems with the truck's brakes, winches, and ram,

including such reports on March 1 and 2. He could offer no explanation for this

omission:

> Q: But what I am trying to get from you, Mr. Dalton, . . . [if] the brakes were significant enough to put them on this driver inspection report and mark they were a safety concern, wasn't the cable just as much of a safety concern to you as these brakes were, if you were afraid it was going to snap and could kill somebody and decapitate someone?
>
> And if so, why was it not on your driver inspection report on March 1 or March 2?
>
> [Petitioner]: That's a good question.
>
> Q: Should it have been?
>
> [Petitioner]: I should have, from the onset, written down everything from the go and never—I should have never, ever not written it down, because I wouldn't have been in the position that I was in.

Tr. 190.

While this evidence calls into question Petitioner's alleged fear that the

cables were dangerous, we do not believe that it is so damning that it

"overwhelms" the other evidence in his favor, rendering that evidence

insubstantial. *See Bowen*, 865 F.2d at 224 ("evidence is not substantial if it is

overwhelmed by other evidence"). Everyone makes foolish omissions from time

-19-

to time. Nor do we find that the remaining evidence in the record undermines the ALJ's finding that Petitioner feared serious injury from the cables.

In sum, substantial evidence supported the ALJ's findings regarding Petitioner's reasonable fear of danger from the cables. Under its own regulations, the Board was required to adopt those findings. Its failure to do so was reversible error.

IV.  **Conclusion**

We **REVERSE** the decision of the Board and **REMAND** for proceedings consistent with this order.

Entered for the Court


Harris L Hartz
Circuit Judge