Victor E. SIMAS, Plaintiff, Appellant,

v.

FIRST CITIZENS' FEDERAL CREDIT UNION and Barbara M.W. Silva, Defendants, Appellees.

No. 98–1450.

United States Court of Appeals, First Circuit.

Heard Dec. 8, 1998.

Decided March 2, 1999.

Philip N. Beauregard, with whom Law Offices of Beauregard & Burke was on brief for appellant.

Michael P. Duffy, with whom Harvey Weiner and Peabody & Arnold LLP were on brief for appellees.

Before TORRUELLA, Chief Judge, ALDRICH and CYR, Senior Circuit Judges,

CYR, Senior Circuit Judge.

Victor E. Simas appeals the district court judgment which dismissed his complaint charging First Citizens' Federal Credit Union ("Citizens") and its president and CEO, Barbara M.W. Silva, with violating the "whistleblower" provisions of the Federal Credit Union Act, 12 U.S.C. § 1790b(a) (FCUA or "the Act"), by retaliating against him for having informed the National Credit Union Administration ("NCUA") that Citizens, notwithstanding its longstanding policy, had made a suspect commercial loan to a member of its board of directors. We vacate the district court judgment and remand for further proceedings.

## I

### BACKGROUND

The district court opinion thoroughly explicates the factual background underlying the present claim. *See Simas v. First Citizens' Fed. Credit Union,* 996 F.Supp. 76 (D.Mass. 1998). Accordingly, we restrict our opening recitation to the essentials.

At all relevant times, Simas was a vice-president under Silva's supervision, with primary responsibility for all delinquent loan collections. In September 1993, Simas

learned that Silva's friend, Louis Xifiras, was about to default on an undersecured commercial loan with an outstanding balance approximating $831,000. Simas considered the circumstances surrounding the 1990 loan to Xifiras suspicious. For one thing, Silva herself had arranged the loan, the largest in Citizens' history, even though Xifiras was serving on the Citizens board of directors at the time and intended to use the proceeds to acquire commercial real estate. Citizens had a longstanding policy against making commercial loans. Moreover, several Board members expressed concern that the $1,030,-000 real estate appraisal, prepared by an appraiser selected by Xifiras, was inflated. Furthermore, Xifiras and Lisa Grace, Silva's daughter and Citizens' senior vice-president for mortgage loans, were rumored to be involved in an extramarital affair. Finally, Ms. Grace personally presented the Xifiras loan application for Board approval.

Simas alerted Silva to his concerns, then asked Citizens' internal auditor to conduct an investigation. The auditor declined. When Simas persisted, the auditor complained to Silva. Simas thereafter informed the auditor that if she chose not to investigate internally, he might be forced to report his concerns to the NCUA or the press.

In October 1993, Silva sent Simas a memorandum advising that his repeated "irrational" and "aggressive" verbal harangues about the Xifiras loan were causing the internal auditor "emotional distress." She characterized Simas' announced intention to contact the NCUA or the press as "threats to the credit union," and his concerns about the Xifiras loan as totally unwarranted. She suggested that Simas was making trouble because he was unhappy with his own working conditions and she explicitly warned that he would be *terminated immediately* if the "verbal harassments [or] unwarranted charges or threats" occurred again. Shortly thereafter, Silva removed Simas from all responsibility for the Xifiras loan. Following this "final warning" from Silva, Simas was informed by Citizens' senior vice-president that he believed Silva should have fired Simas for "stirring [up]" the Xifiras matter.

After Xifiras defaulted on the Citizens loan and declared bankruptcy, the commercial real estate securing the loan was appraised at $538,000. As required by law, Silva reported the loss to the NCUA. Fearing for his job in the event he chose to pursue the Xifiras matter internally, Simas promptly reported his concerns to the FBI and NCUA.

Thereafter, Simas "experienced an abrupt and substantial change in the way that he was treated by [Citizens]." Coworkers shunned him, socially and professionally. Citizens disapproved his car loan application for the first time ever. Although Citizens ultimately approved his education loan application, it did so over Silva's active opposition. Simas was stripped of many work-related privileges consistently accorded him in the past; including (1) attending board of directors meetings, (2) supervising employees in the credit department, (3) approving credit-card applications, (4) personal access to the file vault, and (5) serving as Citizens' acting president in Silva's absence. Silva also refused to consider Simas' request for promotion to a vacant vice-presidency, removed him as network administrator, denied him permission to attend a business-related seminar, and refused his request for a cellular phone. These adverse employment actions were unprecedented.

In January 1994, the NCUA conducted its annual audit of Citizens, devoting an "unusual" amount of time to consultations with Simas. Its audit report noted "the presence of adverse conditions and trends [which] [i]f left unresolved … will jeopardize the financial condition and/or operations of [Citizens]." The NCUA found that the Xifiras loan had been made "without the support of a comprehensive written Member Business Loan program" and that it was improperly preferential in its terms and conditions to a compensated member of the board of directors. The NCUA cited Citizens for allowing Xifiras to engage his own appraiser, directed Citizens to cease making business loans to its members, and ordered that it notify its surety bond carrier of all regulatory violations. Citizens' board of directors accepted the NCUA report. Thereafter, the

NCUA requested that several Citizens' directors resign, including Silva.

In March 1994, Citizens' new internal auditor recommended that Simas start looking for another job. After locating a lesser paying job at another bank, on May 2 Simas submitted his resignation to Citizens, effective May 13. Silva, however, made the resignation effective immediately, and directed that Simas be escorted from the credit union premises in full view of his coworkers, several of whom questioned him about the reason for the unprecedented treatment. In reporting Simas' accelerated "resignation" to the NCUA, Silva characterized Simas as "a disgruntled employee" with access to confidential information. Later, she defined the term "disgruntled employee" as including one who might come into work and shoot his fellow workers.

In due course Simas brought suit against Citizens and Silva in federal district court, alleging violations of the FCUA "whistleblower" provisions, *see* 12 U.S.C. § 1790b(a), together with several pendent state-law claims, including wrongful termination, defamation, and tortious interference with an advantageous relationship. Following discovery, both defendants moved for summary judgment on all claims.

■ The district court granted summary judgment on the FCUA claim, concluding that Simas had not generated a trialworthy dispute as to whether the treatment accorded him after September 1993 was sufficiently adverse to constitute either a "constructive discharge" or "discriminat[ion] ... with respect to compensation, terms, conditions, or privileges of employment," within the meaning of section 1790b(a). Finally, the pendent state-law claims were dismissed for lack of supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3).

---

1. A summary judgment ruling is subject to *de novo* review and all facts in genuine dispute are to be viewed in the light most favorable to the nonmovant in determining whether trialworthy issues exist or the movant was entitled to judgment as a matter of law. *See Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 12 n. 2 (1st Cir.1998).

# II

## DISCUSSION [1]

### A. The Statutory Framework

One of several federal "whistleblower" statutes, the FCUA provides in pertinent part:

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the [National Credit Union] Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

12 U.S.C. § 1790b(a)(1). Should a federal credit union violate section 1790b, the aggrieved employee may bring suit for compensatory damages and "other appropriate actions to remedy any past discrimination." *Id.* § 1790b(c).[2]

■ In according safeguards against retaliation to credit union employees who report potential irregularities, Congress intended to "enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste and insider abuse." H.R.Rep. No. 101–54(I), at 308 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 103–04. Since the case law interpreting section 1790b itself is extremely sparse, however, the courts have looked to case law construing comparably-phrased anti-retaliation provisions in other federal employment-discrimination statutes, such as Title VII, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act (ADA), *id.* § 12101 *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, as well as other federal whistleblower statutes, such

---

2. Neither of the statutory defenses prescribed in the FCUA is implicated in the present case. *See id.* § 1790b(d) (relief unavailable where plaintiff "deliberately cause[d] or participate[d] in the alleged violation of law or regulation," or "knowingly or recklessly provide[d] substantially false information to such an agency or the Attorney General").

as the False Claims Act (FCA), 31 U.S.C. § 3730(h), the Safety Transportation Assistance Act (STAA), 49 U.S.C. §§ 31105(a)(1)(A), and FIRREA § 1831j(a)(1) (providing § 1790b-type coverage to employees of all "insured depository institutions" "with respect to . . . the terms, conditions, or privileges of employment"). We follow their lead. *See LaRou v. Ridlon*, 98 F.3d 659, 663 n. 6 (1st Cir.1996).

## B. *Burdens of Proof*

Many of these federal anti-retaliation statutes require the claimant to make a three-part prima facie showing that: (1) the claimant engaged in the protected activity (*e.g.*, filed a complaint or reported information to the government); (2) the defendants subjected the claimant to some materially adverse employment action, and (3) a causal connection existed between the protected activity and the adverse action. *Cf. BSP Trans, Inc. v. United States Dep't of Labor*, 160 F.3d 38, 46 (1st Cir.1998) (STAA whistleblower provision); *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir.1998) (Title VII retaliation); *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir.1998) (Family and Medical Leave Act). Even under these analogous statutes, however, "[t]he [claimant's] initial burden to establish a prima facie case of discrimination is '*not onerous*' . . . [and] '[a]ll that is needed is the production of admissible evidence which, *if uncontradicted*, would justify a legal conclusion of discrimination.'" *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 26 (1st Cir.1998) (emphasis added; citation omitted); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Under yet other anti-retaliation statutes, moreover, the claimant's prima facie burden on the third or "causation" element is further eased, so as to require only a showing that the protected activity was a "contributing factor" in the adverse action, not necessarily its substantial or motivating cause. *See Frobose v. American Sav. and Loan Ass'n of Danville*, 152 F.3d 602, 612 (7th Cir.1998) (FIRREA § 1831j(a)(1)). Indeed,

Citizens and Silva acceded to the latter prima facie standard below, *see Simas*, 996 F.Supp. at 86, and we accept their concession in addressing the merits on appeal. *See, e.g., Clean Harbors Envtl. Servs., Inc. v. Herman*, 146 F.3d 12, 22 (1st Cir.1998) ("Both parties have accepted this [allocation of the BOP] as the standard and we do not reexamine it.").

Once the claimant makes a prima facie showing, a presumption of retaliation arises and the burden shifts to the defendants. With respect to the former category of anti-retaliation statutes, *see supra* Section II.B, ¶ 1., only the burden of *production* passes to defendants, *i.e.*, requiring them merely to *articulate* not prove a nondiscriminatory motive for their actions. *See Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 24 (1st Cir.1998); *Clean Harbors*, 146 F.3d at 21–22 (STAA). Once defendants meet their minimal burden of production, the initial presumption of retaliatory motivation is removed from the calculus, and the claimant must bear the burden of proving that the nondiscriminatory motive articulated by defendants is pretextual and the real motive was the claimant's decision to exercise the "whistleblower" rights endorsed by the applicable statute. *See Hazel v. United States Postmaster Gen.*, 7 F.3d 1, 3 (1st Cir.1993).

Under the latter variety of anti-retaliation statute, however, *see supra* Section II.B, ¶ 2., the entire burden of *persuasion* passes to defendants, who must then adduce *clear and convincing* evidence that the alleged adverse actions would have been taken regardless whether the claimant had engaged in the protected whistleblower activity. *See Frobose*, 152 F.3d at 612 (FIRREA § 1831j(a)); *see also infra* note 8. Unlike section 1831j(a), however, section 1790b contains no explicit burden-of-proof allocation. Nevertheless, these defendants acceded below to the more plaintiff-friendly burden-shifting paradigm utilized under section 1831j(a), *see Simas*, 996 F.Supp. at 86, which thereby became the law of the case. *See Clean Harbors*, 146 F.3d at 22.

## C. Summary Judgment Rulings

### 1. Defendants' Knowledge of the NCUA Contacts by Simas

The summary judgment motion submitted by Silva and Citizens asserted two grounds for dismissing the FCUA claim; namely, that Simas failed to adduce competent evidence from which a jury rationally might infer that (1) defendants were aware of Simas' contacts with the NCUA prior to his resignation; and (2) their adverse employment actions were consequential enough to constitute either a "constructive discharge" or "discrimination."

Silva unambiguously attested that she could not have retaliated against Silva for contacting the NCUA, because she never knew whether he had carried out his threat to do so until after he had submitted his resignation on May 2, 1994. *See, e.g., Lewis v. Gillette, Co.,* 22 F.3d 22, 24 (1st Cir.1994) (noting that claimant normally cannot establish the requisite causal connection without establishing that "the alleged retaliators knew of the protected plaintiff's activity"). After defendants filed their summary judgment motion, Simas promptly filed a motion for continuance, pursuant to Fed.R.Civ.P. 56(f),[3] in which his counsel asserted that he recently learned from a "highly reliable source" that Michael DeBarros, formerly a Citizens senior vice-president and CFO, had overheard Silva declare in early 1994 that she believed it was Simas who had prompted the NCUA auditor to take such a special interest in the Xifiras loan. Simas' counsel then contacted DeBarros' counsel, who refused to allow his client to file an affidavit out of fear that "Silva might attempt to retaliate against [DeBarros]." Nonetheless, DeBarros' counsel indicated that DeBarros would submit to a deposition under subpoena.

The district court bypassed the question whether Simas had adduced sufficient evidence as to Silva's knowledge. Instead, it rested its grant of summary judgment for defendants on the independent ground that Simas had not adduced enough evidence of a constructive discharge or sufficiently "adverse employment actions." Thus, the district court denied the Rule 56(f) motion as moot. On appeal, however, defendants urge us to affirm on this alternative ground. *See Sammartano v. Palmas del Mar Properties, Inc.,* 161 F.3d 96, 97 n. 2 (1st Cir.1998) (appellate court may affirm summary judgment on any ground apparent in the record). We now address the infirmities in their present position.

First, despite Silva's attestations to the contrary, we seriously question whether Simas needed the DeBarros testimony to survive summary judgment. After all, there is no dispute that Silva knew by the *fall of 1993* that Simas had threatened to contact the NCUA, *see supra* Section I, ¶ 3., and since there is no evidence that any other Citizens employee ever made such a threat, the January 1994 targeted audit of the Xifiras loan documents was a good deal more than a subtle hint that Simas must have alerted the NCUA. Thus, even absent the DeBarros deposition a jury would not have been compelled to conclude that Silva was unaware that Simas was the likely "whistleblower." *See Perez–Trujillo v. Volvo Car Corp. (Sweden),* 137 F.3d 50, 54 (1st Cir.1998) (court cannot resolve genuine credibility issues at summary judgment).

Furthermore, the summary judgment record discloses no principled ground which would preclude the reasonable possibility that the DeBarros deposition would bear the expected fruit. Defendants argue, without citation to authority, that Simas' Rule 56(f) motion was defective because he relied on inadmissible hearsay (*e.g.,* the unnamed "highly reliable source")—rather than his personal knowledge—to conclude that DeBarros could provide the damaging evidence.[4] Their argument fundamentally con-

---

3. Fed.R.Civ.P. 56(f) provides: "Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

4. Normally, a Rule 56(f) motion must: (1) be made within a "reasonable time" after the filing of the summary judgment motion; (2) place the district court on notice that movant wants the

fuses Rule 56(f)'s requirements with those in Rule 56(e) ("Supporting affidavits ... shall set forth such facts as would be admissible in evidence....").

■ "[A] Rule 56(f) proffer need not be presented in a form suitable for admission as evidence at trial, so long as it rises sufficiently above mere speculation." *Resolution Trust Corp. v. North Bridge Assocs.*, 22 F.3d 1198, 1206 (1st Cir.1994) (citing *Carney v. United States*, 19 F.3d 807, 813 (2d Cir. 1994)). "This is as it should be, for Rule 56(f) is best understood as a complement to other provisions contained in Rule 56, allowing the opposing party to explain why he is as of yet unable to file a full-fledged opposition, subject to the more harrowing evidentiary standard that governs under Rules 56(e) and 56(c)." *Id.* at 1206–07. Thus, reliance on hearsay is not, *per se,* a dispositive defect under Rule 56(f).

Furthermore, the Rule 56(f) motion filed by Simas did not rely exclusively on the information provided by the unnamed source, but also on the personal knowledge counsel had gained in subsequent consultations with DeBarros' counsel, who confirmed that DeBarros feared retaliation were he to testify against Silva. The latter evidence would provide rational support for Simas' counsel's suspicion that the DeBarros testimony would prove damaging to Silva. *See id.* at 1207 (finding Rule 56(f) motion valid where multiple sources supported recited facts).

On the present record, therefore, Simas appears to have satisfied all five preconditions for obtaining a Rule 56(f) continuance. *See supra* note 4. "When all five requirements are satisfied ... a strong presumption

arises in favor of relief ... [and the movant] should be treated liberally." *Id.* at 1203. Thus, since the district court never resolved the Rule 56(f) motion on the merits, we cannot affirm its summary judgment ruling on the alternative ground suggested by defendants.

### 2. *The Adverse Employment Actions*
#### (a) *Constructive Discharge*

The FCUA prohibits a federal credit union from engaging in two distinct types of retaliatory employment action: (1) an actual or constructive "discharge"; or (2) other "discriminat[ion] ... with respect to compensation, terms, conditions, or privileges of employment" short of discharge, or what we have sometimes labeled "adverse employment actions." *See* 12 U.S.C. § 1790b(a)(1). The complaint alleged that Citizens constructively discharged Simas,[5] which necessitated that he show that Citizens imposed "working conditions so intolerable [ ] that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir.1993); *see also Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 719 (1st Cir.1994).

The district court concluded, however, that the various "indignities" to which Simas had been subjected were "nothing more than minor slights," *Simas*, 996 F.Supp. at 83, which did not rise to the level of "constructive discharge." It suggested further that the Simas complaint alleged *only* a constructive discharge, and no other adverse employment actions. *See id.* at 84 (citing *Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23,

court to delay action on the summary judgment motion, whether or not the motion cites Rule 56(f); (3) demonstrate that movant has been diligent in conducting discovery, and show "good cause" why the additional discovery was not previously practicable with reasonable diligence; (4) "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist," and "indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion"; and (5) attest that the movant has personal knowledge of the recited grounds for the requested continuance. *See C.B. Trucking, Inc. v. Waste Management, Inc.*, 137 F.3d 41, 44 & n. 2 (1st Cir.1998); *Resolution*

*Trust Corp. v. North Bridge Assocs.*, 22 F.3d 1198, 1202–03 (1st Cir.1994). Although defendants contested the latter three criteria below, their appellate challenge is confined to the fourth and fifth criteria.

5. Moreover, Simas implies that he was *actually* discharged, pointing to Silva's retaliatory decision to accelerate the effective date of his resignation and to cause him to be unceremoniously escorted out of the credit union. *See supra* Section I, ¶ 7. Given our disposition of the appeal, *see infra*, it is not necessary to resolve this implicit contention.

28 (1st Cir.1997)). It stated that, like the plaintiff in *Serrano–Cruz,* Simas had merely alleged damages for "loss of income and employment benefits, loss of personal reputation, and other financial losses ... *and little, if anything, else,*" *id.* (citing Complaint ¶ 32) (emphasis added), and, further, that these economic damages flowed exclusively from Simas' decision to leave his job, rather than from defendants' imposition of adverse working conditions in the months preceding his resignation.

Even assuming *arguendo* the premise that the constructive discharge standard under the FCUA would require proof of more intolerable employment actions than its "discrimination" standard, we need not determine whether the Rule 56 proffer established a prime facie case of constructive discharge since Simas unquestionably alleged "adverse employment actions" as well. *See infra* Section II.C.2(b). Thus, *Serrano–Cruz* is inapposite, both legally and factually.

Unlike Simas, Serrano resigned rather than accept transfer to a different position—at the same salary—which she considered demeaning. We affirmed summary judgment for the former employer because, "by not accepting the newly created and ambiguous position, Serrano foreclosed the possibility of presenting concrete evidence, rather than mere assertions, to a jury regarding the [intolerable] nature of her new working conditions." *Serrano–Cruz,* 109 F.3d at 27. In determining that Serrano had failed to frame her complaint alternatively to allege actionable "adverse employment actions" short of discharge, we noted that all the damages she alleged were purely economic—*e.g.,* lost income—flowing entirely from her decision to reject the transfer and resign, and not from other indignities (*i.e.,* gradual reduction in her job responsibilities) allegedly suffered in the months preceding the transfer. *Id.* at 28.

By contrast, the Simas resignation did not foreclose judicial assessment of the adverse working conditions allegedly imposed by Citizens, most of which *preceded* his resignation. Nor can we agree with Citizens that Simas alleged "little" more than economic damages. Paragraph 32 in the complaint, cited by the district court, alleged "loss of income and employment benefits, loss of personal reputation, other financial losses, *and mental and emotional distress.*" (Emphasis added.) Moreover, although paragraph 32 is part of the defamation count, and not the FCUA count proper, paragraph 36 of the FCUA count expressly realleges and incorporates paragraph 32 by reference. *See also* Complaint Prefatory ¶ 21 (alleging that Simas "was the object of anger and scorn from his superiors, and *he was suffering emotionally and physically as a result* ") (emphasis added).

Thus, the Simas complaint alleged ongoing emotional damages of a type that arose at the time the defendants imposed the adverse employment actions and long before he resigned, culminating in his humiliating exit from the employment premises under the personal escort ordered by Silva. *See Viqueira v. First Bank,* 140 F.3d 12, 16 (1st Cir.1998) (noting that complaints are to be liberally construed). These noneconomic damages are fully and independently recoverable under the FCUA. *See* 12 U.S.C. § 1790b(c)(2) (broadly allowing plaintiff to recover "compensatory damages"); *cf. Hogan v. Bangor and Aroostook R.R. Co.,* 61 F.3d 1034, 1037 (1st Cir.1995) (emotional harm compensable under ADA). Thus, we may bypass the constructive discharge claim.

### (b) *"Adverse Employment Actions "*

We now turn to the sufficiency of the Rule 56 proffer, wherein Simas attested to an extended series of "abrupt and substantial change[s] in the way he was treated as an employee" after he first expressed concerns regarding the Xifiras loan. *See supra* Section I.

At summary judgment the trial court must consider a defendant's alleged conduct both in context and in totality, not merely assess the respective allegations in isolation. *See Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 562–63 (1st Cir.1986) (rejecting "divide-and-conquer" defense strategy); *see also Coffman v. Tracker Marine,* 141 F.3d 1241, 1246 (8th Cir.1998) ("[The] court looks at the *combined effect* of

the employer's actions to determine if there was discrimination") (emphasis added; citation omitted). Thus, otherwise minor slights, relentlessly compounded, may become sufficiently "adverse" to warrant relief under the FCUA.

At the outset we focus on an important consideration—given short shrift by defendants—which sharply distinguishes the present action from the more typical retaliation case. Normally, employers do not leave behind direct evidence of their discriminatory animus, such as express declarations of their retaliatory intentions. Therefore, generally the plaintiff-employee must make do with circumstantial evidence, leaving it to the jury whether to infer from the nature of the materially adverse employment conditions that the defendant-employer harbored a retaliatory animus.

In the present case, however, Simas adduced both circumstantial and *direct* evidence of Silva's retaliatory animus. In her October 8, 1993 memo, Silva not only complained that Simas had harassed the internal auditor, but stated directly to Simas that the charges he made about the Xifiras loan were "unwarranted," and that if he persisted in making "unwarranted charges or threats [to report his suspicions to the NCUA]," he would be terminated immediately. So too, Citizens' senior vice-president told Simas that he thought Silva should have fired Simas outright for "stirring [up]" the Xifiras matter. *See, e.g., Frobose,* 152 F.3d at 616 (affirming denial of summary judgment for employer in § 1831j retaliation case where president's express antagonism toward plaintiff was echoed in antagonistic remarks made by other senior officers).

The term "making unsubstantiated charges," as employed in the Silva memo, is amply expansive to encompass Simas' report to the NCUA, and Silva's express intention to terminate Simas likewise bespeaks a premeditated plan to punish him for the same activity. Given that Silva orchestrated the loan for her friend Xifiras in the first instance, and that the concerns Simas voiced about the loan eventually proved anything but "unwarranted," a jury reasonably could conclude that the sole intendment of her October 8 memo was to prevent Silva's regulatory violations from coming to the attention of the appropriate federal authorities.

So construed, these direct retaliatory expressions by Silva could be considered materially adverse employment actions which *sufficed* to preclude summary judgment for defendants. *See Hernandez–Torres,* 158 F.3d at 47 ("adverse employment actions [may include] ... unwarranted negative job evaluations").

Section 1790b prohibits discrimination relating to "conditions" of employment. Although the term "conditions" may mean merely the physical setting in which one's work is performed, (*e.g.,* reassignment to a remote cubicle), it is not so limited in scope as to exclude illicit supervisory directives conditioning continued employment upon *prohibitions* against employee conduct which is authorized by federal laws governing employer-employee relations. Thus, the explicit direction from Silva that Simas refrain from exercising his federal legal right to contact the NCUA clearly came within section 1790b.

If nothing else, Congress intended that section 1790b deter federal credit unions from expressly dissuading their employees in exercising the statutory right to report suspected regulatory violations. In our case, it is no exaggeration to observe that the "not-so-veiled" threat made by Silva, which by its terms was self-perpetuating, hung like a sword of Damocles over Simas' head.[6]

---

**6.** *See, e.g., Frobose,* 152 F.3d at 615 (finding genuine factual dispute generated by president's letter chastising loan officer for pressing investigation of suspicious undocumented loan, and warning plaintiff "you fully understand the basis from which future management decisions will be made," a warning which "reasonably could be construed as an official and not-so-veiled threat of retaliation") (§ 1381j retaliation case); *Walleri*

*v. Federal Home Loan Bank of Seattle,* 83 F.3d 1575, 1580 (9th Cir.1996) (affirming denial of summary judgment for employer where defendants threatened to remove plaintiff as examiner-in-charge unless she changed her unfavorable report to regulatory authorities); *Lao Chua v. St. Paul Fed. Bank for Sav.,* No. 95-C-2463, 1995 WL 472773, at *3 (N.D.Ill. Aug.8, 1995) (refusing to dismiss § 1831j retaliation case where defen-

Moreover, pursuit of the Xifiras loan investigation by Simas was in no sense *ultra vires,* since it is difficult to conceive a "condition" more materially adverse to the proper performance of the fiduciary duties of the senior vice-president for loan collections.

At this juncture, of course, we do not suggest that a jury would be compelled to construe this direct evidence adversely to defendants, who presumably would contend that (i) Silva truly believed the Xifiras loan was not problematic,[7] (ii) Simas raised his concerns in bad faith because he was disgruntled with what he perceived as Silva's preferential treatment of her daughter to the detriment of other Citizens officers; and (iii) Silva's memo sought only to urge Simas to cease his overly aggressive efforts to initiate an *internal* investigation, and keep any intentions to contact the NCUA to himself.

▮ Be that as it may, any such credibility determinations are for the factfinder at trial, not for the court at summary judgment. *Perez–Trujillo,* 137 F.3d at 53. "[T]rial courts should 'use restraint in granting summary judgment' where discriminatory animus is in issue." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (citation omitted).

▮ Further, given defendants' concessions regarding the allocation of burdens of proof, *see supra* Section II.B, the Silva memo would support a finding that whatever other motives Silva may have harbored (*e.g.,* her pique at Silva's alleged badgering of the internal auditor), a retaliatory motivation was at least one "contributing factor" in her campaign to oust or silence Simas. Thus, the burden of persuasion would pass to the de-

fendants to adduce clear and convincing evidence that they would have engaged in the same litany of alleged employment actions even if Simas had not contacted the NCUA. *See Frobose,* 152 F.3d at 615 ("Given that the burden of proof on this point is assigned *to the defendant,* and questions of intent and credibility will often be raised, particular care must be taken to resolve all doubts in favor of the plaintiff.")(emphasis added; citations omitted).[8]

In all events it is unnecessary to determine definitively whether the direct evidence, *standing alone,* demonstrated a materially adverse employment action. At a minimum the direct evidence necessarily colors and informs the circumstantial evidence of the adverse employment action which followed. " '[T]erms, conditions, or privileges' is pretty open-ended language ... [which] obviously includes opportunities that are not strictly entitlements, and a number of cases have extended coverage to slights or indignities that might seem evanescent." *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997). "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." *Blackie v. State of Maine,* 75 F.3d 716, 725 (1st Cir.1996). "Determining whether an action is materially adverse necessarily requires a *case-by-case* inquiry. Moreover,

---

dants told plaintiff not to report to federal authorities that they had ordered him to divulge his secret code, and physically prevented plaintiff from reporting their planned regulatory violation).

7. Conversely, however, even a good-faith belief by Silva that the charges were unwarranted would not entitle her to deter Simas from exercising his § 1790b rights. Section 1790b does not require that the information provided be proven true, so long as the informant did not knowingly or recklessly provide false information. *See supra* note 2.

8. Likewise, in a Title VII case where the claimant adduces *direct* (rather than circumstantial)

evidence of discriminatory animus, and the defendant adduces some countervailing evidence that its motives were "mixed" (*i.e.,* some discriminatory, some not), the burden of *persuasion* passes to the defendant to show that it would have taken the same actions even if the improper criterion had played no part in its decisionmaking. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Clean Harbors,* 146 F.3d at 21–22 (same under STAA); *see also Frobose,* 152 F.3d at 617. In order to uphold summary judgment for defendants, therefore, we would have to conclude that the direct evidence *compelled* a jury verdict in their favor, which is simply not possible on the present record.

the inquiry must be cast in objective terms. Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Id.* (emphasis added; citations omitted).

██ Our review leads us to conclude that these employment actions, viewed in aggregate, could be considered "materially adverse." The fact that Citizens did not reduce Simas' salary or benefits, though plainly relevant, is not conclusive. *See Serrano–Cruz,* 109 F.3d at 26 (ADEA); *Collins v. State of Illinois,* 830 F.2d 692, 702–03 (7th Cir.1987) (Title VII).

The district court overlooked the crucial, undisputed fact that Silva withdrew from Simas all responsibility for the Xifiras account. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (conduct is adverse employment action if it "constitutes a significant change in employment status, such as . . . reassignment with significantly different responsibilities"); *Collins,* 830 F.2d at 703 & n. 7 (describing various changes to basic aspects of the job). As the vice-president for collections and credit, Simas' core responsibility was to collect delinquent loans, and the $838,000 Xifiras loan was by far the largest Citizens loan.[9] Thus, Simas clearly was not acting *ultra vires* in investigating the Xifiras loan. Rather, there can be no serious question that removing Citizens' chief loan and collection officer from any responsibility whatever for its largest outstanding loan represented a very substantial divestment of responsibility. Thus, since the FCUA implicitly focuses on individuals like Simas insiders with an optimal opportunity to uncover improprieties it would be ironic to hold that a jury could not even *consider* whether Silva's decision to take the Xifiras loan account away from Si-

mas constituted an adverse employment action.

There was evidence that Simas had been divested of other responsibilities and perquisites as well. For example, Simas attested that he had been stripped of his supervisory authority over credit department personnel and the power to approve credit-card applications. *See Dahm v. Flynn,* 60 F.3d 253, 258–59 (7th Cir.1994) (noting that "terminating [plaintiff's] supervisory authority over other employees" may constitute an adverse employment action) (First Amendment retaliation). Yet the district court found this evidence too vague and conclusory to survive summary judgment because Simas "proffer[ed] no facts to explain the extent of his prior authority and the significance of the 'removal.'" *Simas,* 996 F.Supp. at 85. We cannot agree.

██ It is axiomatic on summary judgment, of course, that "the nonmoving party 'may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." *DeNovellis,* 124 F.3d at 306 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 12–13 (1st Cir.1994). Nor may the court accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed. *See Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 6 (1st Cir.1998). On the other hand, the competence of the nonmovant's own testimony is treated no differently than that of any other potential trial witness. Thus, the nonmovant's statements normally pass muster *provided* they (1) are made "on personal knowledge" of the facts or events described;

9. *See DeNovellis,* 124 F.3d at 306 (holding that divesting employee of consequential assignments and responsibilities establishes an adverse employment action); *see also Coffman,* 141 F.3d at 1245 ("Coffman also had her duties at work changed, including the loss of her responsibility for ordering coil and extrusion, important raw materials in the manufacturing of boats at the Bolivar plant. These ordering duties represented a substantial part of Coffman's job as inventory

control manager."); *Vasbinder v. Ambach,* 926 F.2d 1333, 1343 (2d Cir.1991) (in First Amendment retaliation case, defendant "promptly stripped [plaintiff] of his most significant duties"); *cf. Underwood v. District of Columbia Armory Bd.,* 816 F.2d 769, 777 (D.C.Cir.1987) (affirming judgment for defendant on retaliation claim where duties of which plaintiff was divested "were only a minor adjunct to her regular position").

and (2) neither depend on inadmissible hearsay nor (3) purport "to examine the [movants'] thoughts as well as their actions." *See, e.g., Maiorana v. MacDonald,* 596 F.2d 1072, 1079–80 (1st Cir.1979); *see also* Fed.R.Civ.P. 56(e).

Although pithy, the attestations made by Simas adverted to such facts and events. Simas undoubtedly would have direct personal knowledge of his *own* job functions, including whether he had exercised authority over credit department personnel and approved credit-card applications in the past. Therefore, his attestations are statements of *fact,* not subjective characterizations. Thus, while the defendants may present evidence contesting their truth, to the extent they do so they simply preclude summary judgment for *either* party. *See Brennan,* 150 F.3d at 26 (plaintiff's prima facie burden is " 'not onerous' ... [and] '[a]ll that is needed is the production of admissible evidence which, *if uncontradicted,* would justify a legal conclusion of discrimination.' ") (emphasis added). Nor can we say that no rational jury could conclude that these two privileges were consequential, if for no other reason than defendants' own concession that Simas' official job title was vice-president of collections *and credit. DeNovellis,* 124 F.3d at 308 (" '[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' ").

In a similar vein the district court ruled that the contention that Simas had been denied a car loan could not demonstrate an adverse employment action. *Simas,* 996 F.Supp. at 83. Defendants argue that (1) they have no record of the loan application and Simas failed to adduce a copy; and (2) Simas failed to attest to facts demonstrating that he was otherwise qualified to receive a car loan. Neither argument is valid.

First, "there is no general rule that proof of a fact will be excluded unless its proponent furnishes the best evidence in his power." *See Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1543 (11th Cir.1994) (citation omitted). Thus, Simas can prove he filed a loan application simply through his own trial testimony. *See* Fed.R.Evid. 1002 ("To prove the content of a writing, ... the original writing ... is required, *except as otherwise provided in these rules* or by Act of Congress.") (emphasis added); Fed.R.Evid. 1004(1) (original document need not be produced if the original was lost or destroyed, except where party opposing admission proves the proponent lost or destroyed the original in bad faith); Fed. R.Evid. 1004(3) (original need not be produced if it was under the control of the party against whom it was offered, which did not produce it at hearing); *see also United States v. McMahon,* 938 F.2d 1501, 1509 n. 4 (1st Cir.1991).

Second, Simas attested to the *fact* that Citizens had always approved his loan applications in the past, without objection. At least absent evidence that his financial condition had changed, this constituted competent evidence that Citizens considered Simas financially qualified to receive such loans. *See Blackie,* 75 F.3d at 726 ("[U]nder certain circumstances an employer's inaction can operate to deprive an employee of a privilege of employment that an employee had reason to anticipate he would receive."). Hence, Simas met his prima facie burden of proof, and the burden of persuasion thereupon shifted to defendants to show the true reason for the loan denial.[10] Finally, we cannot say that the denial of a car loan must be considered inconsequential *per se.*

Simas likewise attested that he was denied unfettered access to the file vault. The only rejoinder from defendants is that Citizens banned all officers, not only Simas, from accessing the vault, and that Simas was per-

10. Although Simas may have abandoned the argument on appeal, the same is true of his attestation that he was denied promotion to a vacant vice-presidency. The district court discounted this evidence because it was undisputed that Citizens' board of directors voted not to fill the vacant position; hence denial of the Simas application could not have been discriminatory or retaliatory. *Simas,* 996 F.Supp. at 86–87. Given Silva's influence over the Board, however, the burden of persuasion would shift to defendants to show by clear and convincing evidence that the Board had not left the position vacant because Simas applied for it, biding its time until Simas had been ousted from his job.

mitted to obtain any file he wanted through a vault clerk. These claims are flawed as well.

For one thing, Simas was only required to attest that the new vault-access procedure was materially adverse. As vice-president in charge of collections, his need for vault access was evident. Moreover, in light of Silva's October 8 memo, a jury reasonably could find the timing of the new procedure especially suspect, since it interposed a vault clerk between Simas and important bank documents at precisely the time Silva sought to deter any further investigation of the Xifiras loan by Simas. Requiring Simas to make a request for a specific document from a vault clerk clearly had two adverse effects: (1) Simas could not anonymously examine documents in the vault; and (2) Silva could learn from the vault clerk precisely which files Simas was examining. Although Silva explained: "We were having a problem with the vault[,] of officers going into the vault, and pulling files and never being replaced[,]" her decision to make the new vault-access procedure applicable to all bank officers does not preclude a finding that she harbored an illicit motive in doing so; that is, to reduce access to information by Simas.[11] Thus, the burden of persuasion would pass to defendants to show by clear and convincing evidence that the new vault-access procedure was necessary for reasons independent of Simas' threats to alert the NCUA.

Finally, although the evidence of yet other adverse employment actions may be less compelling, it is not so obviously makeweight as to *compel* inferences in defendants' favor.[12] Since we are required to assess defendants' conduct in context and in

totality, rather than piecemeal, *see Calhoun*, 798 F.2d at 562–63; *Coffman*, 141 F.3d at 1246, we conclude that summary judgment on the FCUA claim was improvidently granted, and must be vacated. The state-law claims for defamation, wrongful termination, and tortious interference with an advantageous relationship must be reinstated as well, since the district court dismissed them solely for lack of supplemental jurisdiction. *See Alexis v. McDonald's Restaurants of Mass., Inc.*, 67 F.3d 341, 354 (1st Cir.1995) (remand on state-law claims warranted where federal claim is reinstated).

*The district court judgment is vacated and the case is remanded for further proceedings consistent with this opinion. Costs are awarded to appellant.*

*SO ORDERED.*

BAILEY ALDRICH, Senior Circuit Judge, concurring.

Judge Cyr's opinion, which I entirely accept, reads very persuasively. So, however, does the district court's. In choosing to go along with the later one, I note several matters. To begin, whistleblowers face many obstacles. In the first place, they face those whom they charge, and the higher up those persons, the more difficult they are to meet. In the second place, whistleblowers face others who, if not directly concerned, know on which side their bread is buttered. These obstacles must always be remembered. It must also be remembered that whistleblowers are Congressionally approved, rather than everybody's enemy.

Next, it is to be noted that there is an odor pervading this case. Consider the exception-

---

11. The same reasoning applies to the contention that Simas was no longer allowed to attend meetings of the board of directors, where one reasonably might expect the Xifiras loan default to be a topic of debate. *See Coffman*, 141 F.3d at 1245 ("There was also evidence that Tracker Marine excluded Coffman from some management meetings that, as inventory control manager, she would have been expected to attend.").

12. Simas attested that coworkers shunned him, both socially and professionally. While social ostracism alone is rarely actionable, professional ostracism may be, at least where the plaintiff can show that defendants incited or encouraged coworkers to shun him, and plaintiff suffered some

material harm resulting from his inability to consult with his colleagues on matters of business. *See, e.g., Parkins v. Civil Constructors of Ill.*, 163 F.3d 1027, 1039 (7th Cir.1998); *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir.1998); *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir.1997); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir.1996). Also, Simas attested that Citizens' new internal auditor told him in March 1994 that he should start looking for another job. *Cf. Serrano–Cruz*, 109 F.3d at 27–28 (noting that express suggestions that plaintiff resign are probative of constructive discharge).

al, indeed unique, size of the loan; the way it was granted, particularly the selection of the appraiser; and the relationship of the parties in interest, specifically, the fact that the borrower sat on the credit union's board of directors at the time and was allegedly involved in an extramarital affair with its senior vice-president for mortgage loans. Consider also, at least in passing, the amount that the collateral proved to be below the indebtedness, not to mention the required excess. This all produced a substantial odor that cannot be made to disappear simply by attacks that may be voiced against the plaintiff individually.

With all this in mind, I note that this is summary judgment.