NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0194n.06
Filed: December 30, 2004

No. 03-4464

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


| | | |
|---|---|---|
| Dave J. McNett | ) | |
| | ) | |
|     Plaintiff-Appellant | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Hardin Community Federal Credit Union | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
|     Defendant-Appellee | ) | |


**Before: COLE and ROGERS, Circuit Judges; COHN**, District Judge.[*]


**ROGERS, Circuit Judge**.    Plaintiff Dave McNett appeals from the grant of summary

judgment issued in favor of his former employer, Hardin Community Federal Credit Union ("the

credit union"), on his claim of retaliatory discharge in violation of the whistleblower provision of

the Federal Credit Union Act ("FCUA").  Because McNett has established a genuine issue of

material fact regarding whether he was discharged in retaliation for engaging in activity protected

under the FCUA, we reverse the grant of summary judgment.

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

## I.  Background

### A.  McNett's Employment with Hardin Community Federal Credit Union

Hardin Community Federal Credit Union is a community credit union located in Hardin County, Ohio, with approximately 6500 members.  On August 12, 2002, the plaintiff, Dave McNett, began working for the credit union as a full-time collections manager, a position created by the credit union in response to a significant increase in the number of its loans that were delinquent.

### B.  Delinquencies and "Due Date Bumping"

McNett alleges that his firing resulted from his reporting of mismanagement of the credit union's delinquent loans.  Upon starting his position, McNett was informed that the credit union's board of directors was concerned about the increase in delinquent loans.  Delinquent loans are those where the credit union has not received a payment from a member by the due date.  The credit union had a policy of extending due dates for members in hardship cases.  The policy required the member to make only interest payments on loans.  In return, the due date would be extended, also known as "due date bumping," meaning the account would not show up on the delinquent loan report even though no principal payment had been made.  The due date of several members' accounts were also advanced without any interest payment being made, although this was against policy, thus making the delinquency rate appear less than it actually was.  The credit union uses a computer program to track and maintain member accounts.  When a loan due date is altered, the teller number of the employee who made the change is noted, along with a code of "CPC" next to the transaction.[1]

---

[1]The source of the acronym CPC is unclear from the record.

**C.  The National Credit Union Administration and Its Examination of Hardin Credit Union**

Credit unions are regulated by the National Credit Union Administration ("NCUA").  The NCUA generally conducts yearly on-site examinations of credit unions.  The delinquency ratio of a credit union and its delinquent loans are focuses of the NCUA examinations.  The NCUA had scheduled its yearly examination of the credit union for June 2002, but delayed the examination until the end of September 2002.  McNett claims he was informed that, "although the NCUA examiners were to start their exam in September 2002, they were only going to look at the delinquent loans that existed at and prior to June of 2002."

**D.  McNett's Investigation of the CPC Code**

During the first forty days of his employment with the credit union, McNett claims he was able to collect approximately half a million dollars and reduce the amount of delinquent loans owed to the credit union.  Although McNett's work should have decreased the amount of delinquent loans held by the credit union, there was a significant increase in the amount of delinquencies reported in the next month's loan report.  Disturbed, McNett then began investigating the cause of the sudden increase.  During this investigation, McNett noticed the CPC code next to many of the delinquent loans where a payment had not been made, which caused the computer to treat the loan as though a payment had been made.  Apparently, McNett then realized that the increase in delinquent loans in September was a reflection of the delayed maturing of loans that had been advanced using the CPC code.  The NCUA had begun its examination by the time McNett reached this conclusion.

After learning the extent of the due date bumping, McNett: (1) brought up the jump in September delinquencies to Matt Jennings, the Credit Union's CEO, while an NCUA examiner was in the room; (2) sent a letter to the personal residences of two of the credit union's board members

3

that mentioned the drastic jump in delinquent loans in September; and (3) privately met with NCUA examiner Ralph Cave and informed him of the due date bumping. McNett did not tell anyone at the credit union about the meeting with Cave and asked the examiner not to reveal McNett as the source of the information. In the meeting with Jennings and in the letter to the Board, McNett did not mention the use of the CPC code or due date bumping. Instead, he only mentioned the rise in delinquencies, without explaining the cause.

Following McNett's meeting with Cave, the NCUA examiners asked Jennings and Cinda Terrill, the Lending Manager, what the CPC code was on a particular account, what it did and who posted it. Initially, both Jennings and Terrill stated that they did not know, but eventually revealed that the code meant that a loan's due date had been advanced. McNett alleges that, after these events had transpired, several employees began to treat him as the source of the NCUA's interest in the CPC code.

## E. The Termination of McNett

McNett was terminated on October 17, 2002, 13 days after he met with the NCUA examiner. McNett claims the termination resulted from his meeting with Mr. Jennings in front of an NCUA examiner, the meeting with an NCUA examiner at a hotel, and the letter to the members of the credit union's board. McNett alleges that he was discharged in violation of the whistleblower provision of the Federal Credit Union Act, 12 U.S.C. § 1790b(a)(1). The district court found that McNett had not created a genuine issue of material fact regarding whether he was terminated for engaging in protected activity under the FCUA.

## II. Analysis

There is sufficient evidence to conclude that the Credit Union knew that information about the use of the CPC code had been given to the NCUA examiners and that McNett was the source. In addition, there is a genuine issue about whether the Credit Union's proffered reasons for McNett's termination were pretextual.

This court reviews a lower court's grant of summary judgment *de novo*. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). When considering a motion for summary judgment, the evidence should be viewed in the light most favorable to the nonmoving party, and summary judgment should only be granted where there is no genuine issue of material fact. *Id.*

McNett alleges that he was terminated in retaliation for engaging in activity protected by the Federal Credit Union Act. The whistleblower provision of the Federal Credit Union Act provides:

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.[2]

12 U.S.C. § 1790b(a)(1). In providing credit union employees with protection against retaliation, "Congress intended to 'enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste, and insider abuse.'" *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 43 (1st Cir. 1999) (quoting H.R.Rep. No. 101-54(I), at 308 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 103-04). "Since the case law interpreting section 1790b itself

---

[2]There are two defenses to § 1790b: "(1) [the employee] "deliberately causes or participates in the alleged violation of law or regulation, or (2) [the employee] knowingly or recklessly provides substantially false information to such an agency or the Attorney General." 12 U.S.C. § 1790b(d). Neither of these defenses applies in this case.

5

is extremely sparse, however, the courts have looked to case law construing comparably-phrased anti-retaliation provisions in other federal employment-discrimination statutes."[3] *Id.*

**A. McNett has established a prima facie case of retaliation under the FCUA**

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate the following elements: (1) that he engaged in the protected activity; (2) that defendant knew of this exercise of his protected rights; (3) that defendant subsequently took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). McNett and the credit union both agree that McNett's meeting with NCUA examiner Ralph Cave constitutes protected activity, and that McNett suffered an adverse employment action. However, they disagree about whether having a conversation with Jennings regarding the jump in delinquencies, in front of an NCUA examiner, and sending a letter to two members of the credit union's board of directors, also constitute protected activity. They also disagree about whether the credit union had any knowledge of McNett's protected activity. Because McNett has presented a genuine issue of material fact regarding whether the credit union knew of his meeting with NCUA examiner Ralph Cave, we need not decide whether the conversation in front of CEO Jennings or the letter sent to the credit union's board members constituted protected activity for purposes of § 1790b.

Although the credit union concedes that McNett engaged in activity protected by the FCUA when he met with NCUA examiner Ralph Cave to discuss the use of the CPC code, the credit union

---

[3]Such statutes include Title VII, the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA), the False Claims Act (FCA), the Safety Transportation Assistance Act (STAA), and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). *Simas*, 170 F.3d at 43-44 (citations omitted).

claims that it did not have knowledge of the meeting and that the protected activity therefore could not have formed the basis for McNett's termination. While there is no evidence that the credit union had actual knowledge about the meeting between McNett and the NCUA examiner, McNett has created a genuine issue of fact regarding whether the credit union had, in fact, realized that the NCUA examiners had been told about the practice of due date bumping and that McNett was the source of that knowledge.

The credit union had reason to suspect that the NCUA examiners had been told by someone about the practice of due date bumping. Immediately after the meeting between McNett and the NCUA examiner, the NCUA examiners went to the credit union to attempt to verify the information provided by McNett. During this inquiry, the NCUA examiners specifically asked CEO Jennings and Lending Manager Terrill about the function of the CPC code. The NCUA examiners' ability to target the source of the problem accurately, coupled with the fact that they asked credit union officials about what the CPC code was, how it was used, and who was responsible for adjusting it, is enough to create a genuine issue of material fact regarding whether the credit union realized that the NCUA had been told about the practice of due date bumping.

In addition to suspecting that the NCUA examiners had been told about the use of the CPC code, the credit union also had reason to suspect that McNett was the source of that information. McNett had previously notified CEO Jennings and members of the credit union's board about his concern regarding the rising delinquency rate. In addition, McNett was a new employee in a small organization, consisting of approximately twelve employees. It is reasonable to conclude that, if the credit union suspected that information about the use of the CPC code had been given to NCUA examiners, the inquiries made about the delinquency rate by McNett and the fact that he was the new

7

employee in a small organization would lead it to suspect him as the source. Thus, McNett has established a genuine issue of material fact regarding whether the credit union knew of his involvement in protected activity.

Because McNett created a question about whether the credit union knew of his involvement in protected activity, it follows that McNett has raised a genuine issue regarding whether his involvement in protected activity caused his termination. McNett was terminated only 13 days after he met with the NCUA examiner. While mere temporal proximity between an employee engaging in protected activity and suffering an adverse employment action is insufficient to demonstrate causation, the employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the particular circumstances strengthen the inference of causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Thus, McNett has created a genuine issue about whether the credit union knew of his involvement in protected activity; therefore, he defeats summary judgment with regard to his prima facie case of retaliation under the FCUA.

**B. McNett has established a genuine issue of material fact regarding whether the Credit Union's proffered reasons for his termination were pretextual.**

In addition to establishing a prima facie case of retaliation sufficient to withstand summary judgment, McNett has also created a genuine issue about whether the credit union's proffered reasons for his termination were pretextual. Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a nondiscriminatory reason for the action taken. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 184 (6th Cir. 2004). Once the employer has proffered a legitimate reason for the adverse employment action, the burden shifts back to the

8

plaintiff to show that the employer's stated reason was pretextual. *Id.* "To do so, the plaintiff is required to show either: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision." *Id.*

In the current case, the credit union claims that it terminated McNett for insubordination, primarily relying upon two events: (1) shortly after beginning work, McNett told CEO Jennings that he did not think he should be reporting to Lending Manager Terrill, partially because he believed a conflict of interest may exist; and (2) McNett sent a letter discussing the jump in delinquency rates to the personal residences of two credit union board members.

McNett has presented sufficient evidence to create a genuine issue of material fact regarding whether the given reasons for his termination were pretextual. The incident involving McNett's telling CEO Jennings that he did not wish to report to Lending Manager Terrill occurred months before he was terminated. While Jennings claims that he was upset about the issue at the time and that he placed a disciplinary memo in McNett's personnel file, Jennings never told McNett that he was upset about the event or that he had placed a memo about the event in his file. Rather, the first time the memo was shown to anyone was after McNett had met with the NCUA examiners. Similarly, it is debatable whether the letter sent to members of the credit union's board, which was not rude or offensive, would be enough to cause the credit union to terminate McNett. McNett has thus created a genuine issue of material fact about whether the credit union's proffered non-discriminatory reasons for his firing were pretextual.

### III. Conclusion

McNett has demonstrated a genuine issue of material fact regarding whether the credit union knew of his involvement in activity protected under the FCUA, and whether that involvement was the cause of his termination. McNett has therefore established a prima facie case of retaliation under the FCUA. In addition, McNett has established a genuine issue of material fact regarding whether the credit union's proffered reasons for his termination were pretextual. The district court's grant of summary judgment is accordingly REVERSED, and the case is REMANDED for proceedings consistent with this opinion.